**Julia ROSADO, Lydia Hernandez, Majorie Miley, Sophia Abron, Ruby Gathers, Louise Lowman, Bula Mae King, Cathryn Folk, Annie Lou Phillips, and Majorie Duffy, individually, on behalf of their minor children, and on behalf of all other persons similarly situated, Plaintiffs,**

**v.**

**George K. WYMAN, individually and in his capacity as Commissioner of Social Services for the State of New York, and the Department of Social Services for the State of New York, Defendants.**

**No. 69 Civ. 355.**

United States District Court
E. D. New York.

May 15, 1969.

Supplemental Opinion June 18, 1969.

See also, D.C., 304 F.Supp. 1346, 1354.

MEMORANDUM ON PRELIMINARY
INJUNCTION AND SUMMARY
JUDGMENT

WEINSTEIN, District Judge.

Plaintiffs bring this class action to challenge the validity of section 131–a of the New York Social Services Law, Mc-Kinney's Consol.Laws, c. 55, effective July 1st of this year (ch. 184, L.1969). They allege that it is void because it does not meet the standards laid down by section 402(a) (23) of the Social Security Act of 1935, as amended in 1968, for participation by a state in the federally-funded Aid to Families with Dependent Children program (AFDC). *See* 42 U.S.C. §§ 601, 602; 45 C.F.R. § 233.20(a) (2) (i'), 34 Fed.Reg. 1394 (1969). Section 402(a) (23), they contend, requires a state, if it is to participate in AFDC, to take into account increases in the cost of living in computing new benefit levels. Their claim is that New York State, while it continues to participate, has reduced scheduled AFDC payments.

Both plaintiffs and defendants have moved for summary judgment. In addition, plaintiffs have moved for a preliminary injunction to enjoin the defendants

from instituting changes pursuant to section 131–a until this litigation can be decided on the merits.

■ The test for granting summary judgment is whether there exists "any 'genuine issue as to any material fact.' F.R.Civ.P. 56(c); see, F.R.Civ.P. 56 (e)." Waldron v. Cities Service Co., 361 F.2d 671, 672 (2d Cir. 1966), aff'd sub nom. First National Bank of Arizona v. Cities Service Co., 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968). The test for granting a preliminary injunction is whether plaintiffs have made "a clear showing of probable success and probable irreparable injury." Clairol Incorporated v. Gillette Company, 389 F. 2d 264, 265 (2d Cir. 1968). See F.R.Civ. P. 65.

For the reasons stated below, it is clear that plaintiffs have a substantial claim with a high likelihood of prevailing on the merits and that they will probably suffer irreparable damage unless a preliminary injunction is granted. Accordingly, such an injunction will issue.

There are still a number of unresolved questions of fact. The statistical and other data underlying this dispute have not yet been developed with clarity sufficient to warrant the granting of summary judgment. Pursuant to Rule 56(f) of the Federal Rules of Civil Procedure, this Court orders "a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had" or testimony and exhibits to be presented.

Because of the importance of this matter we assume that defendants will wish to take an immediate interlocutory appeal pursuant to section 1292(a) (1) of title 28 of the United States Code from the order granting the preliminary injunction. In order to render as much assistance as possible to the Court of Appeals and to the parties we have set out below the posture of the case in more detail than is ordinarily warranted in disposing of preliminary applications. It should be emphasized that the conclusions are made only for the purpose of deciding the motions before us and are not determinative of the merits of the case.

## I. JURISDICTION

In King v. Smith, 392 U.S. 309, 88 S. Ct. 2128, 20 L.Ed.2d 1118 (1968), the Supreme Court left open the question "whether and under what circumstance suits challenging state AFDC provisions only on the ground that they are inconsistent with the federal statute may be brought in federal courts." 392 U.S. at 312, n. 3, 88 S.Ct. at 2131. Since plaintiffs equal protection claim is no longer before this Court (Rosado v. Wyman, 304 F.Supp. 1354 (E.D.N.Y.1969) (*per curiam* opinion of three-judge court)), we must confront the question of our jurisdiction to decide the federal statutory claim. We conclude that there are a number of independent bases of jurisdiction.

### A. *Pendent Jurisdiction*

■■ Once its jurisdiction has been properly invoked, a federal district court acquires pendent jurisdiction to decide all related claims arising out of the same transaction or dispute. *See, e.g.,* United Mine Workers v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); Hurn v. Oursler, 289 U.S. 238, 53 S.Ct. 586, 77 L.Ed. 1148 (1933); Gulickson v. Forest, 290 F.Supp. 457, 464 (E.D.N.Y.1968). The district court has power to decide the pendent claim even if it does not reach the issue which provided the basis for the court's jurisdiction or even if it first decides the jurisdiction-founding issue against the plaintiffs. *See, e.g.,* King v. Smith, 392 U.S. 309, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968); United Mine Workers v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); Siler v. Louisville & Nashville R. Co., 213 U. S. 175, 29 S.Ct. 451, 53 L.Ed. 753 (1909); Gulickson v. Forest, 290 F.Supp. 457, 464 (E.D.N.Y.1968).

■ In the present case, it is clear that at the time the three-judge court was convened jurisdiction existed pur-

suant to section 1343(3) of title 28 and sections 1983 and 1988 of title 42 of the United States Code. These provisions grant original jurisdiction to the federal district courts, without respect to the amount in controversy, over cases where it is claimed that a right under the United States Constitution is being violated. The three-judge court, in its *per curiam* opinion, noted that it had been "properly convened" (Rosado v. Wyman, 304 F.Supp. 1354 (E.D.N.Y.1969)), thereby impliedly ruling that a substantial federal question had been raised. *See, e. g.*, Swift & Co. v. Wickham, 382 U.S. 111, 115, 86 S.Ct. 258, 261, 15 L. Ed.2d 194 (1965) ("no such [three-judge] court is called for when the alleged constitutional claim is insubstantial"); Kramer v. Union Free School Dist. No. 15, 379 F.2d 491 (2d Cir. 1967). There is no doubt that under the liberal test recently enunciated by the Supreme Court in United Mine Workers v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130 (1966), the cause of action based on the Social Security Act would be considered pendent to the equal protection claim.

The question posed is whether this Court has been divested of pendent jurisdiction because the federal constitutional claim was rendered moot after the three-judge court convened and heard argument on motions by all parties for summary judgment. For the reasons stated below, we hold that under the circumstances of the instant case, this question must be answered in the negative.

■ Federal courts, in the exercise of discretion, have tended to voluntarily abstain from deciding pendent questions where the claim which provided the basis for its jurisdiction has been disposed of prior to trial. *See* United Mine Workers v. Gibbs, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966) ("Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well"); Wham-O-Mfg. Co. v. Paradise Mfg. Co., 327 F.2d 748, 752–754 (9th Cir. 1964); Strach-

man v. Palmer, 177 F.2d 427, 431 (1st Cir. 1949) (concurring opinion); Note, The Evolution and Scope of the Doctrine of Pendent Jurisdiction in the Federal Courts, 62 Colum.L.Rev. 1018, 1025 (1967); *Cf.* Clairol Incorporated v. Gillette Company, 389 F.2d 264, 267–268 (2d Cir. 1968) (jurisdiction over unfair competition claim despite concession of lack of valid trademark registration); Rogers v. Valentine, 37 F.R.D. 231 (S.D. N.Y.1964) (after summary judgment granted on federal claim, jurisdiction retained over pendent non-federal claim).

The rationale for this doctrine of restraint in the exercise of pendent jurisdiction is that a federal court should seek to avoïd "[n]eedless decisions of state law":

> Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law. United Mine Workers v. Gibbs, 363 U. S. 715, 726, 86 S.Ct. 1130, 1139, 16 L. Ed.2d 218 (1966).

*See also* Wham-O-Mfg. Co. v. Paradise Mfg. Co., 327 F.2d 748, 753 (9th Cir. 1964); Strachman v. Palmer, 177 F.2d 427, 431, 433 (1st Cir. 1949) (concurring opinion). Accordingly, applying what has been referred to as "the introduction of evidence test," some federal courts have held that "when a federal claim is dismissed *on the pleadings,* the court should not retain a related nonfederal claim absent an independent basis for federal jurisdiction." Note, The Evolution and Scope of the Doctrine of Pendent Jurisdiction in the Federal Courts, 62 Colum.L.Rev. 1018, 1025 (1962) (emphasis in original).

Application of this rule would be entirely inappropriate, wasteful of judicial energy and extremely prejudicial to the litigants in a case such as the one before us. The pendent claim does not involve state law alone, but poses crucial and important questions of federal statutory law. It vitally affects a national program designed to protect the funda-

mental rights of children to the sustenance and stable family life which will enable them to develop into full members of our society capable of exercising their rights and responsibilities under the United States Constitution and it involves the expenditure of billions of dollars of federal monies. The courts in the federal system are in at least as good a position as state courts to adjudicate this question of federal law. Nor can this be described as a petty or unimportant controversy of the kind Congress sought to exclude from the federal courts.

We do not mean to suggest that the New York State courts would be more likely to fall into error or to show hostility toward federal law than would a federal court. We are only deciding now whether it is appropriate for a federal court to divest itself of jurisdiction of a pending case.

■ Factors to be taken into account in deciding this question include "judicial economy, convenience, and fairness to litigants." United Mine Workers v. Gibbs, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966). These criteria provide justification for the doctrine of pendent jurisdiction generally; they compel retention of jurisdiction in the instant case.

A speedy determination of this litigation is highly desirable. From the point of view of the plaintiffs, an unnecessary reduction of their benefits may reduce their income below subsistence level, causing grievous harm. From the state's vantage point, an unnecessary extension of any temporary restraining order preventing institution of the new reduced benefits would, according to the testimony of a Deputy Commissioner in the State Department of Social Services, result in a loss to the state of up to ten million dollars a month. Dismissal, under the abstention doctrine, would require plaintiffs to commence a new suit in the state courts. The resulting loss of time would make it impossible to decide the issues before administrative arrangements must be made to implement the new state

statute by its effective date—July 1, 1969.

Furthermore, the parties have already presented substantial testimony, affidavits and briefs to the Court. The expenditure of time by the litigants and the Court would be, to a large extent, wasted were all these materials to be offered anew in a state court.

Having found that pendent jurisdiction exists, we need not reach the question whether administrative remedies must be exhausted in a suit challenging a state AFDC provision solely on statutory grounds. See King v. Smith, 392 U.S. 309, 312, n. 4, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968); National Welfare Rights Organization v. Wyman, 304 F.Supp. 1346 (E.D.N.Y.1969) (HEW not necessary party); cf. Note, Federal Judicial Review of State Welfare Practices, 67 Colum.L.Rev. 84, 91–92 (1967) (inadequacy of federal administrative forum).

B. *Federal Question Jurisdiction*

■ Section 1331 of title 28 of the United States Code also supports jurisdiction. This provision grants the district courts jurisdiction over all civil actions arising under "the Constitution, laws, or treaties of the United States" provided that "the matter in controversy exceeds the sum or value of $10,000."

There is no doubt that the first requirement is met since plaintiffs allege that the challenge state statute violates section 402(a) (23) of the Social Security Act. Defendants contend, however, that the controversy does not involve more than $10,000.

■ In determining whether this prerequisite has been satisfied in a class action of this kind, the claims of the individual plaintiffs or individual members of the class may not be aggregated. Snyder v. Harris, 394 U.S. 332, 89 S.Ct. 1053, 22 L.Ed.2d 319 (1969). *Compare* 1 Moore, Federal Practice ¶ 0.91[1] at p. 827 (2d ed. 1964) *with* Wright, Federal Courts 100 (1963). Nevertheless, for purposes of jurisdiction in this case, each family may be considered as a unit and

the claims of each member of a single AFDC family can be combined because the federal statutory program involved is designed to protect the family as a unit.

If we only look to the impending reductions in welfare payments that any family in the class may suffer, the monetary loss to each of the plaintiffs does not approach $10,000. Yearly welfare payments may not be multiplied by a number of years in the future to make up the $10,000 requirement because it is too speculative to assume that any particular plaintiff will remain on welfare for such a period or that the program will remain unchanged.

While the direct damage to each member of the class does not suffice, the indirect damage to each plaintiff and her charges may be very high. The test for determining the amount in controversy relies heavily upon plaintiffs' good faith and the certification of lawyers pursuant to Rule 11 of the Federal Rules of Civil Procedure that there is "ground to support" the pleadings. It has been described by the Supreme Court as follows:

> The rule governing dismissal for want of jurisdiction in cases brought in the federal court is that, unless the law gives a different rule, the sum claimed by the plaintiff controls if the claim is apparently made in good faith. It must appear to a legal certainty that the claim is really for less than the jurisdictional amount to justify dismissal. St. Paul Mercury Indemnity Co. v. Red Cab Co., 303 U.S. 283, 288, 58 S.Ct. 586, 590, 82 L.Ed. 845 (1938).

See also Horten v. Liberty Mutual Ins. Co., 367 U.S. 348, 353, 81 S.Ct. 1570, 6 L.Ed.2d 890 (1960); Wright, Federal Courts 94–95 (1963).

There is before this Court uncontradicted evidence, by testimony and affidavits, that members of the class are at or below a bare subsistence level. Under such circumstances, a reduction in welfare benefits putting their income substantially below that threshold may threaten injuries to their children's physical and mental development far greater than the mere monetary loss in benefits. Cf. Brown v. Board of Education, 347 U.S. 483, 494, 74 S.Ct. 686, 98 L.Ed. 873 (1954) (psychological damage resulting from improper schooling). Deprivations during early years may irreversibly retard mental and physical development and have an adverse impact on personality.

Without intimating that the position of these plaintiffs is at all comparable, the possibility of a serious injury resulting from a comparatively minor deprivation may be more clearly seen if we look at the situation of a Biafran child. A few cents a day is enough to prevent starvation or permanent maiming of such a child; several dollars a year might mean the difference between a healthy life and a stunted life or death. To such a child, the question whether $100 in foodstuffs should be granted or withheld over a period of a year involves the monetary value of a human life.

We need not go outside the record in this case to consider general literature and Congressional hearings on the grave and permanent harm, particularly to the children involved, that might result from a reduction in welfare payments. Typical of the material before this Court are some of the affidavits quoted below.

A Professor of Pediatrics and Attending Physician in a ghetto hospital with "a great many patients who are recipients" of public assistance swears that many of them "have marginal nutritional status;" that "a decrease in the amount of assistance which these individuals receive for the purchase of food would create a deficiency in their diets and could lead to clinical malnutrition;" that "malnutrition tends to retard the physical and mental growth" of children and "may greatly diminish the ability of the individual to learn;" that this deficiency "will remain with the individual for life;" that children born of "undernourished mothers" have a substantially increased tendency to premature birth with "greater incidence of infant mortal-

ity and an increased likelihood of mental and neurological damage;" and that elimination of special diets and other assistance by reductions such as those proposed by the statute in question will cause damage "to individual recipients * * * so great as to be incalculable."

A Senior Social Worker at a Medical Center swears that "at existing welfare levels most welfare recipients live in a state of constant anxiety, depression, frustration, and physical suffering due to the inadequacy of their welfare grants" and as a result of the proposed reductions the "suffering which will result * * * will cause irreparable, and incalculable, harm."

A Certified Social Worker with 28 years experience, employed by the Community Service Society of New York, Inc., swears that as a result of the reductions, "Serious unattended health problems will multiply and proliferate, children's ability to achieve in school will be even further depleted, diets will be at a starvation level as families try to stretch their grossly inadequate budgets to meet their most basic needs * * *;" and that "Family life, already strained, will be * * * severely jeopardized."

The Chief of Budget Standard Service of the Community Council of Greater New York swears that "deprivation [from the new proposed standard] will result in incalculable hardship and misery to the already severely deprived families in our community."

A Dean of a School of Social Work swears that the proposed reduction will cause "great harm to the physical, mental, emotional and moral health of these families."

A Professor at a medical college and Director of a Neighborhood Health Center swears that "any diminution in income [of the families involved in this litigation] will worsen an already intolerable situation, resulting in irreparable damage."

A Retired Medical Director of the United States Public Health Service serving as Deputy Director of Obstetrics and Gynecology in a ghetto hospital and Professor at a college of medicine swears that "the possible harm afflicted upon pregnant mothers and newborn children is incalculable."

In view of the relatively trivial injuries which result in recovery of more than $10,000 in this Court, it cannot be said that under no view of the facts is the amount in controversey less than $10,000 as to any member of the class.

C. *Jurisdiction Under 28 U.S.C. § 1343 (3)*

Plaintiffs also invoke section 1343(3) of title 28 of the United States Code as a basis for jurisdiction. This provision grants the district courts original jurisdiction of any civil action, irrespective of the amount in controversy, to "redress the deprivation, under color of any State law * * *, of any right, privilege or immunity secured by * * * any Act of Congress providing for equal rights of citizens." Plaintiffs assert that this section, when read with section 1983 of title 42, grants federal courts jurisdiction over controversies involving substantial individual rights protected by federal welfare statutes. Because jurisdiction to decide the statutory claim of invalidity is clearly founded both on section 1331 of title 28 and upon pendent jurisdiction arising from section 1343(3) of title 28, we need not and do not address ourselves to this position. *Cf.* King v. Smith, 392 U.S. 309, 312, n. 3, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968). *Compare* Cover, Establishing Federal Jurisdiction in Actions Brought to Vindicate Statutory (Federal) Rights When No Violations of Constitutional Rights Are Alleged, Clearinghouse Review, February-March, 1969 at p. 5; Note, Federal Judicial Review of State Welfare Practices, 67 Colum.L.Rev. 84, 112–14 (1967) *with* Note, The Proper Scope of the Civil Rights Acts, 66 Harv. L.Rev. 1285, 1291–93 (1953).

## II. GENERAL NATURE OF FEDERAL-STATE PROGRAM FOR AID TO FAMILIES WITH DEPENDENT CHILDREN

New York, together with every other state, participates in the AFDC program established by the Social Security Act of 1935. Section 401 of the Act provides that the federal government shall make "payments to States which have submitted, and had approved by" the federal government "State plans for aid and services" to "needy dependent children and the parents or relatives with whom they are living." These federal payments are made on a matching fund basis. Administration of the program is entirely in the hands of the states, although each state's plan must meet the several requirements of the Social Security Act and the rules and regulations promulgated by the United States Department of Health, Education and Welfare (HEW). 42 U.S.C. § 602. *See* King v. Smith, 392 U.S. 309, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968).

Each state participating in AFDC must formulate, in monetary amounts, standards of need and levels of benefits based upon these standards. 45 C.F.R. § 233.20(a) (2) (i), 34 Fed.Reg. 1394 (1969). Theoretically, a standard of need is equal to the total cost of all of the items deemed to be necessary for subsistence. Those whose incomes are below the applicable standard of need are eligible for welfare assistance.

A state is free to determine the items, and their costs, to be included in a standard of need. In practice, it may not include all the necessary items or the prices used may not reflect true cost. That this is often the case is evidenced by affidavits and supporting memoranda submitted to the Court establishing that welfare budgets tend to be below the level which most studies indicate is necessary for normal daily functioning and healthy family life.

Were a state paying 100% of its standards of need, the amount of the welfare grant to a recipient would be equal to the difference between his income and the applicable standard of need. But, many states' levels of benefits are not determined solely by their standards of need. Some impose a flat maximum on the amount of the benefit—*i.e.,* no family can receive a welfare grant of more than a stated number of dollars, an amount which varies according to the size of the family, even if this sum does not fully cover the budgetary deficit indicated by its own computation. Other states apparently pay only a fixed percentage of need—*e.g.*, if the standard of need were $100 per month, the state would pay 80% of need and a person without other income would thus receive only $80 per month.

Since "each State is free to set its own standard of need and to determine the level of benefits" (King v. Smith, 392 U.S. 309, 318–319, 88 S.Ct. 2128, 2134, 20 L.Ed.2d 1118 (1968)), the sums paid by different states to comparable families under the AFDC program vary considerably. Thus, 29 states pay 100% of what they define as standards of need, while Mississippi pays only 27% of its standards of need. The average monthly AFDC payment per recipient, as of June, 1968, ranged from a high of $71.75 in New York to a low of $8.50 in Mississippi.

## III. NEW YORK'S CURRENT PROGRAM

Under present law, New York's levels of benefits have purportedly been designed to fully make up budgetary deficits as defined by its standards of need. The New York Department of Social Services is authorized to establish grant levels "in accordance with standards of public health in the community with due regard for variations in cost from time to time and between localities." N.Y. Social Services Law § 131(3). Pursuant to section 131 of the New York Social Services Law, the Regulations of the Department of Social Services provide that "all items of basic maintenance and all items of special need required by [individual] case circumstances"

shall comprise the recipient's "estimate of regularly recurring need" and are to be included in the welfare budget. 18 N.Y.C.R.R. § 353.1(d). The "recurring cash grant shall be the full budget deficit,"—that is, the excess of "the estimate of regularly recurring need" over the recipient's "available resources." 18 N.Y.C.R.R. §§ 353.1(a), (d); 353.3 (a). *See also* 18 N.Y.C.R.R. § 353.1(c) (a person shall be eligible for assistance if a "budget deficit exists or when the budget surplus is inadequate to meet one or more non-budgeted special needs").

New York welfare allowances have consisted of two separate types of grants. First, the basic, recurring grant to cover food, clothing, household supplies, school expenses, and other items of basic subsistence, exclusive of rent and fuel for heating which are added to the allowance of the recipient on a separate basis. The amount of this grant varies with the size of the family and the age of the oldest child (18 N.Y.C.R.R. § 352.4 (a), (b)) because older children, particularly growing teenagers, require more in the way of food and clothing.

Payments are presently made according to three schedules promulgated by the State Commissioner of Welfare. One of them, set out below, covers the area of New York City and nearby counties where most persons receiving aid reside.

SCHEDULE SA–1

NEW YORK CITY AND COUNTIES OF: Dutchess, Greene, Monroe, Nassau, Suffolk, Ulster and Westchester. Monthly

| | One Person | Two Persons | Three Persons | Four Persons | Five Persons | Six Persons | Seven Persons | Eight Persons | Nine Persons | Ten Persons |
|---|---|---|---|---|---|---|---|---|---|---|
| Oldest child 5 years of age or under | | 94 | *125 | *152 | *180 | *204 | *234 | *262 | *293 | *320 |
| Oldest child 6 or 7 | | 107 | *138 | *165 | *192 | *216 | *246 | *275 | *304 | *332 |
| Oldest child 8 or 9 | | 107 | 152 | *178 | *203 | *228 | *259 | *288 | *317 | *344 |
| Oldest child 10 or 11 | | 107 | 152 | 191 | *218 | *240 | *271 | *300 | *329 | *356 |
| Oldest child 12 or 13 | | 118 | 162 | 201 | 240 | *262 | *292 | *321 | *351 | *378 |
| Oldest child 14 or 15 | | 118 | 173 | 211 | 250 | 283 | *314 | *343 | *372 | *400 |
| Oldest child 16 or 17 | | 118 | 173 | 221 | 259 | 293 | 335 | *364 | *394 | *421 |
| Oldest child 18 or 19 | | 118 | 173 | 221 | 269 | 302 | 345 | 386 | *415 | *443 |
| Oldest child 20 or 21 | | 118 | 173 | 221 | 269 | 312 | 354 | 395 | 437 | *464 |
| Adults | 66 | 110 | 156 | 198 | 238 | 274 | | | | |

* When there is more than one adult in households with an asterisk, add $16 for each additional adult.

For a pregnant woman in any size household, add $5.50
For an AABD recipient living alone, add $8. [Aid to Aged, Blind and Disabled.]
For each AABD recipient in a family group, add $5.
For each additional person over 10 in the household, add $32.

Any recipient under age 21 is budgeted as a child unless he is receiving assistance as the parent of a minor child and is not regularly attending school. When not budgeted as a child, such minor is budgeted as an adult.

The other two schedules, covering upstate areas, are similar in form but somewhat lower in amounts.

In August of each year, the Department of Social Services has adjusted these schedules, based on a cost-of-living survey conducted in May of the same year, to reflect changing price levels. Since prices have been rising for some time, the yearly adjustment has required increases in standards of need and levels of benefits. Schedules presently in effect are based on a May, 1968 cost-of-living survey. They were issued on August 23, 1968 and each local Department of Social Services was required to implement them within nine months of August 1, 1968.

As supplements to the basic grant shown in Schedule SA–1, above, New York provides what it calls "special needs" grants. Special needs grants are designed to cover expenses for extraordinary or non-recurring items such as

major items of clothing and furniture and household supplies (18 N.Y.C.R.R. §§ 352.4(c), 352.5(j)), medically-dictated special diets (18 N.Y.C.R.R. § 352.4(b) (7), (8), (9)), moving expenses (18 N.Y.C.R.R. § 352.5(m)), and expenses incident to education (18 N.Y.C.R.R. § 352.5(d)). *See also* 18 N.Y.C.R.R. §§ 352.4(c) (iv) (layette); 352.4(b) (6) (i) (restaurant allowance for persons unable to prepare meals at home); 18 N.Y.C.R.R. 352.5(b), (c) (expenses incident to employment and securing employment); 352.5(g) (child care services); 352.5(h) (laundry services); 352.5(i) (telephone service when such service is incident to the production of income, health, or safety); 352.5(p) (transportation expenses to secure medical care or other essential verified transportation needs). These grants are required because it is recognized that the basic schedules provide no surplus from which additional needs can be met.

Pursuant to a "demonstration project" instituted on August 27, 1968 in New York City, many—but not all—of the special needs grants for City residents were replaced by a flat grant of $100 per year per person. A family of four, for example, would receive $400 per year. This flat grant was designed to eliminate the necessity of the welfare recipient applying for many small individual items as they were needed.

Affidavits, studies and testimony before the Court agree that the present schedules, as supplemented by cyclical grants and special grants, are not in excess of present minimum requirements for life at the lowest acceptable level in New York. As the Commissioner of the Nassau County Department of Social Services put it, speaking of the pre-section 131–a situation, "the present standards of assistance provide for life on a level of sustenance, nothing more, and often less." Or, as the Deputy Commissioner in the State Department of Social Services testified, AFDC recipients "of necessity have learned to squeeze every penny."

## IV. NEW YORK'S NEW PROGRAM

Section 131–a is intended to substantially alter the welfare system in New York State beginning in July, 1969. In place of the present administratively drawn schedules based on annually determined costs of living, the size of the family and the age of the oldest child, it substitutes a system of flat grants set by the legislature and varying solely with the size of the family. All special grants, including the $100 flat cyclical grant for New York City residents, are abolished (except for the special grant for the replacement of clothing and furniture destroyed by flood or fire). Two separate schedules of payments are created, one solely for New York City and a lower one for the rest of the state. The levels of payments established by the latter schedule may be increased administratively in any social services district within the state based on the cost-of-living, so long as it does not exceed the schedule for the City of New York. *See* Rosado v. Wyman, 304 F.Supp. 1354 (E.D.N.Y.1969).

Set out below is the statutory schedule of maximum grants to residents in the City of New York:

### Number of Persons in Household

| One | Two | Three | Four | Five | Six | Seven |
|-----|-----|-------|------|------|-----|-------|
| $70 | $116 | $162 | $208 | $254 | $297 | $340 |

For each additional eligible needy person in the houshold there shall be an additional allowance of fourty-three dollars monthly.

To these sums is added the cost of rent and fuel. This schedule and the one for the rest of the state, the statute declares, "shall be deemed to make adequate provision for all items of need."

The state's brief describes "the method of establishing the levels set forth in the schedules contained in the statute" as follows:

The mean age of the oldest child in each size family was ascertained. The mean age rather than the median was used as this produced a more generous result in most cases. The amount of allowance provided in 1968 for a family of each size in cases where the oldest child was of the mean age was then adopted as the allowance for that size family. Where the mean age contained a fraction, the older age was used, again working a benefit to the recipient. Thus, for a family of four, which received amounts ranging from $152.00 to $221.00 (depending upon the age of its oldest child), the mean age of such oldest child was found to be 10.09 and, therefore, $191.00—the figure where the oldest child was ten or eleven, was used as a base amount. To this was added $17.00—the amount necessary to bring the allowance up to $35.35, the subsistence level determined by the United States Government for New York City for a family

of four, or a monthly allowance of $208.00. The allowance for the remainder of the state was determined at a differential of $25.00 for a family of four. As the computations of the Department show, these levels, based on the previous allowance including the cost of living increases of 1968, will result in slightly increased benefits to families with younger children and slightly decreased benefits to those with older children. Memorandum of Law in Support of Defendants' Motion for Summary Judgment, pp. 9–10.

It is not yet clear how such a statistically even-handed technique resulted in even steps of either $43 or $46 as the size of the family increased.

Special grants were seemingly not included in these computations. No attempt was made to average them out across the state and then to add that figure to that of the basic recurring grant.

Each of the individual plaintiffs in this action will suffer substantial cuts ranging up to 20% in their welfare payments as a result of section 131–a. Set out below is a table listing the individual plaintiffs, the number of dependents of each plaintiff, the monthly grant exclusive of rent each is currently receiving, and the maximum under section 131–a that each may receive:

| Plaintiff | Size of Family and Age of Oldest Child | Current Grant | Maximum Under 131–a |
|---|---|---|---|
| Rosado | 5 people, oldest child 14 | $280 | $254 |
| Hernandez | 3 people, oldest child 16 | $218 | $162 |
| Miley | 10 people, oldest child 15 | $535 | $469 |
| Abrom | 7 people, oldest child 13 | $406 | $340 |
| Gathers | 7 people, oldest child 19 | $382 | $340 |
| Lowman | 8 people, oldest child 14 | $396 | $383 |
| King | 9 people, oldest child 17 | $482 | $426 |
| Folk | 4 people, oldest child 16 | $337 | $208 |
| Phillips | 5 people, oldest child 14 | $314.40 | $224 |
| Duffy | 10 people, oldest child 20 | $563.40 | $389 |

(Plaintiffs Phillips and Duffy are residents of Nassau County. If they resided in New York City, or if the Commissioner of Social Services increases their

maximums as much as the statute permits, their respective maximums under section 131–a would be $254 and $469.)

As a result of the abolition of special grants, plaintiff Abrom, for example, will not receive the following grants now supplied to her: $15 a month for large sized clothing for her children; $15 a month for medically required special diets; and $5.80 a month for laundering diapers. Plaintiff Miley will not be able to receive the following special grants now supplied: $155 a month for a homemaker and $9 a month for a telephone, both required for medical reasons; and $80 a month for special diets for herself and her family.

## V. EFFECT AND PURPOSE OF NEW YORK'S NEW PROGRAM

In the state's view it "was not the case" that section 131–a resulted in a "reduction of standards;" rather, it contends, section 131–a was intended to, and did, maintain the standard of need while providing administrative streamlining. Reply Memorandum for Defendants, pp. 7–8. Its brief declares:

the adoption of § 131–a was the fruit of continuous legislative and departmental study of the problem of maintaining a standard of need during a period of sharply increasing numbers of recipients, especially in the ADC program. To avoid a reduction, administrative streamlining and elimination of individual determinations of eligibility for a plethora of special grants was regarded as essential. *Ibid.*

The advantages of a system of flat grants to the recipient are, the state contends,— and the plaintiffs do not dispute this— substantial:

the flat grant concept, regarded as the most enlightened and progressive method of public assistance payment, eliminating the necessity of the welfare recipient applying for individual items—often a degrading and time-consuming process—and thereby enhancing his dignity, increasing his

ability to budget and self-respect, and freeing case workers from bookkeeping decisions in order to allow them to devote their time to counseling of recipients. Memorandum of Law In Support of Defendants' Motion for Summary Judgment, p. 8.

The state's position that section 131–a was designed to reform New York's welfare system and eliminate administrative expense is belied by the statistical information presently available to this Court and the legislative history of the new statute.

### A. Effect of Section 131–a on Standards on Need and Levels of Benefits

The data before this Court indicates that section 131–a affects a reduction of New York's standards of need and levels of benefits. While a large percentage of families, particularly those living outside the New York City metropolitan area with young children and with little need for special grants, will receive more under the new system than they do at present, a substantial majority of the AFDC families in the state will suffer a reduction in their payments on July 1, 1969. The amount of the reductions is not yet clear.

Most beneficiaries of the AFDC program live in New York City (657,000 out of a state total of 887,000 was the 1968 monthly average). The Acting Deputy Director of the Bureau of Fiscal Administration of Social Services of the City of New York has made the following computations of the effect of section 131–a based upon statistics supplied by a State Department of Social Services study of July, 1968 and 1969–70 caseload projections:

The total benefits lost to clients [in New York City] will be $39,142,768. 63.5% of the cases will lose while 36.2% gain. The average annual loss per case will be 343.81 while the average gain is 145.55.

These computations have been controverted by defendants' testimony which

indicates that 41.5% of AFDC cases in New York City would receive increases, 58.1% would receive decreases and .04% would remain unchanged. One reason for the discrepancy appears to be that defendants' estimates, unlike plaintiffs', are based only on a comparison of the recurring grant and do not attempt to calculate the effect of eliminating the special and cyclical grants.

The effect on upstate residents seems to be less severe; according to defendants, approximately 51% suffer cuts, while 49% are afforded increases. Any possible gain to upstate residents, who comprise only a small percentage of AFDC recipients, probably does not offset the reductions to City residents of total amount of aid paid. It is not yet clear whether this result would be changed if counties outside New York City took advantage of the opportunity afforded by the amendment to section 131–a discussed in the *per curiam* opinion of the three-judge court, Rosado v. Wyman, 304 F.Supp. 1354 (E.D.N.Y.1969), and raised their schedules of payments to New York City levels.

Computations of loss by the parties apparently do not include allowance for a cost-of-living adjustment which has heretofore been made administratively each year in May. Under section 131–a, no cost-of-living adjustment will be made in 1969 even though it is undisputed that the New York City Area Consumer Price Index has risen at an average rate of 0.5% per month in the last two years and that the rate of increase has accelerated since February of this year.

Defendants argue that the elimination of the cyclical grant and the special grants are not to be considered in determing whether the standard of payment has been reduced. First, they argue that these grants "were over and above New York's payment of 100% of its standard of need" and, thus, "totally gratuitous on the part of the State." Memorandum of Law in Support of Defendants' Motion for Summary Judgment, p. 25. This argument is difficult to credit. The testimony of witnesses

for the plaintiffs and the witness for the defendant agree that New York does not pay more than is required for bare subsistence. Special grants are not luxuries; they are merely a different method for meeting family and individual need for bare necessities. In fact, New York's definition of the standard of need prior to adoption of section 131–a included items covered by special grants:

> An individual or family shall be deemed "in need" when a budget deficit exists or when the budget surplus is inadequate to meet one or more non-budgeted special needs required by the case circumstances and included in the standards of assistance. 18 N.Y.C.R.R. § 353.1(c).

*See also* 18 N.Y.C.R.R. § 353.1(d) ("all items of basic maintenance and all items of special need required by case circumstances" comprise the recipient's "estimate of regularly recurring need").

Second, defendants suggested on argument that the State Commissioner of Welfare was considering promulgating regulations providing for some of the special grants "on a purchase of service basis." To date we have not been favored with a copy of such regulations. It is not clear whether these regulations will, if adopted, cover cyclical or special grants to the same extent as they were covered prior to adoption of section 131–a.

██ In any event, assistance provided on a purchase of services basis could not be considered as "aid paid" by the state within the meaning of section 402 (a) (23) of the Social Security Act (42 U.S.C. § 602(a) (23)) in determining whether New York is in compliance with federal standards. Under the AFDC program "aid to families with dependent children means *money payments* with respect to * * * a dependent child or dependent children." 42 U.S.C. § 606 (b) (emphasis supplied). Purchases of services with direct payment to vendors, does not comply with the federal requirements and with HEW regulations designed to protect the "amounts of aid

paid" under the AFDC program. *See* HEW Handbook of Public Assistance, Part IV, Section 5120 et seq.; 45 C.F.R. 233.20(a) (ii), 34 Fed.Reg. 1394 (1969). A state apparently may not claim federal reimbursement for the provision by vendor payments or purchase of service' of "subsistence and other assistance items" normally included in a standard of need unless the federal statute and regulations specifically so provide. *See* 42 U.S.C. § 602(a) (13) and (14); 45 C.F.R. Parts 220 and 226, 34 Fed.Reg. 1243, 1354 (1969) (child welfare, family planning and other family services may be purchased; other services must be provided by the agency itself).

The requirement that payments be in cash gives recognition to the right to freedom of choice by, and to self-respect of, the recipient of welfare. Thus, the interpretation of section 406(b) of the Act (42 U.S.C. §§ 606(b)) in the HEW Handbook reads as follows:

> The provision that assistance shall be in the form of money payments is one of several provisions in the act designed to carry out the basic principle that assistance comes to needy persons as a right. The right carries with it the individual's freedom to manage his affairs; to decide what use of his assistance check will best serve his interests; and to make his purchases through the normal channels of exchange, enjoying the same rights and discharging the same responsibilities as do friends, neighbors, and other members of the community. The Social Security Administration's interpretation of "money payments" recognizes that a recipient of assistance does not, because he is in need, lose his capacity to select how, when, and whether each of his needs is to be met.

B. *Legislative History of Section 131–a*

■ Motive and purpose of the legislature may be considered in determining what it in fact did. *Cf.* Williams v. Dandridge, 297 F.Supp. 450 (D.Md.1969) (maximum grant regulation motivated by "an inadequate State appropriation"). An examination of the legislative history of section 131–a, read together with the state budget, casts considerable doubt upon the defendants' contention that the new schedules were designed wholly, or even primarily, to meet the demands of efficiency.

The proposal to convert to a flat grant system was initiated by the New York State Board of Social Welfare. In its report to the Governor in May, 1968, it recommended flat grants "based on family size and the age of the oldest child" to "include food, clothing, personal incidentals, household supplies, school expenses" and the like, with "additional money amounts" in certain circumstances such as special diets or moving expenses, which are not common to all recipients." Challenge and Response, 4 (May 1968).

This proposed change was not designed to reduce standards of need or payments. In a letter of Commissioner Wyman to the Governor's Counsel dated September 13, 1968, the flat grant system was spelled out in great detail. The schedules included were those in present section 131, not the reduced schedules in section 131–a. Moreover, many special grants such as those for special clothing and for diet supplements for pregnant women and medical patients were provided. And there was a provision for annual repricing of schedules "whenever the repricing shows an increase or decrease of 2% or more."

This proposal was never introduced in bill form; in its stead, section 131–a was substituted. The reason for this change is revealed by retracing part of the labyrinth leading to the adoption of the 1969–70 state budget.

The Governor's proposed budget, dated January 21, 1969, did not indicate any plan for a shift in methods of computing standards of need. See Executive Budget for the Fiscal Year April 1, 1969 to March 31, 1970, 566–67, 571–72, 778-780. AFDC payments were expected to continue "to increase principally because of the increasing cost of living and a continued demand by public assistance

recipients for the granting of special need items in addition to the basic subsistence allowances." *Id.* at 779. The percentage of federal aid was expected to decline because of a "freeze" on the number of children to be aided and restricted participation in cases of aid due to unemployment of a parent. *Ibid.* Based upon monthly AFDC averages, the projected number of recipients for 1968-69 was 917,235 and for 1969–70 it was 1,095,704. The average budgeted monthly grant was $74.57 for 1968–69 and $83.37 for 1969–70. *Id.* at 779. The total 1969–70 AFDC program cost was projected at $1,096,172,000; $440,195,000 was anticipated in federal aid. *Id.* at 778. The estimated cost-of-living increase for 1969–70, based upon the system then in effect, was $5,000,000 and this sum was apparently included in the $1,096,172,000 figure. Since the share of the state and of local social service districts is almost equal *(id.* at 778), $321,125,000 was budgeted for 1969–70 as the state's share of the 1969–70 AFDC program. The total Local Assistance Fund for State Aid Programs for the Department of Social Services was budgeted at $1,040,514,000: *Id.* at 786. *See also* Sen. 1689, Ass. 2305 (1969).

Because "necessary expenditures are expected to outstrip available funds," the Governor reported, "a reduction in the level of recommended budget expenditures by approximately 5 per cent across-the-board may be required." Executive Budget for the Fiscal Year April 1, 1969 to March 31, 1970, M7. The Local Assistance Fund, including AFDC contributions by the state, was to be "limited to 95 per cent of the amount of expenditures otherwise estimated * * * to keep expenditures within available income." *Id.* at 739. This would have reduced the category of state aid to AFDC by approximately $16,000,000 and all programs of state social service local aid would have been reduced by $52,-000,000 to $988,000,000.

It is not clear from the Governor's proposals whether the total AFDC program cost was intended to be reduced 5% from $1,096,172,000, for a cut of approximately $55,000,000, or whether the local social service districts were expected to increase their share, leaving the total program cost unchanged. In any event, no one suggested that the 5|% cut was anything but a money saving device.

During the legislative session the Governor's proposed budget was modified to provide greater aid than the Governor had requested for some items but to reduce the state AFDC appropriation even further. The budget bills do not show the detailed amounts for each category of local aid but show a lump sum for all *categorical assistance.* Instead of $988,000,000 proposed by the Governor (after his 5% cut), $913,000,000 was appropriated. Sen. 1689–A, Ass. 2305–A (adopted March 29, 1969, ch. 49, L. 1969). This constituted a reduction of approximately 12% from the original projected cost. We are informed that departmental computations indicate that $297,441,000 was the amount intended for the AFDC program, a saving of $23,-684,000 or about 7|% over the Governor's Budget. When the .$5,000,000 amount in the Governor's Budget for 1969 cost-of-living increases is eliminated the reduction is $18,684,000, or about 6%. Since the state's share is some 34|%, the decrease in total AFDC payments under the program seems to have been at least some $50,000,000.

A further reduction of $42,000,000 was made by the supplemental budget, making the total reduction in local aid for categorical assistance some 16% from what the Governor's Budget had estimated as projected costs. Sen. 5692, Ass. 7205 (adopted May 2, 1969, ch. 340, L. 1969). Defendants have indicated, in a letter to the Court dated May 14, 1969, that the $42,000,000 cut in the Supplemental Budget was taken "from the $297,441,000 figure" for local AFDC aid. We are told by the State that this reduction was made in contemplation of increased federal aid and that if this sum is not supplied by the federal govern-

ment "the 1970 Legislature would be requested to cover the amount in a supplementary budget."

Timing of legislative action shows the close relation between the new AFDC program and budgetary decisions. Section 131–a was not introduced until February 18, 1969 in the Assembly (Ass. 6620) and March 27, 1969 in the Senate (Sen. 5419), some time after the Governor's Budget Message was delivered on January 21, 1969. The amendment was adopted on March 29, 1969, the same day as the budget. There is good reason to believe, when the budget is read with section 131–a, that a cut in the projected cost of the total AFDC program as well as in the state contribution was intended.

Since a reduction of levels of payments, based on projections, was likely to be required to achieve these budgetary reductions, since all affidavits and testimony indicate that payments have not been above the standard of need, and since New York continues to purport to pay at 100% of standard of need under section 131–a, there is strong support for the contention that standards of need and levels of payments were reduced.

This Court is not, of course, concerned with justifications for state budgetary decisions, nor does it sit to discourage desirable improvement in the efficiency of state welfare programs. The issue before us is whether the system of reducing standards of need and levels of payments embodied in section 131–a violates federal statutes. We turn now to the relevant federal provision for an answer to that question.

## VI. FEDERAL LIMITATIONS ON REDUCTIONS IN AID TO DEPENDENT CHILDREN

### A. *Purpose*

Paragraph (23) of subdivision (a) of section 402 of the Social Security Act of 1935, as amended (42 U.S.C. § 602(a) (23), requires that each state's AFDC plan must:

provide that by July 1, 1969, the amounts used by the State to determine the needs of individuals will have been adjusted to reflect fully changes in living costs since such amounts were established, and any maximums that the State imposes on the amount of aid paid to families will have been proportionately adjusted.

This provision was effective January 2, 1968. Pub.L. 90–248, Title II, § 202 (b); 81 Stat. 821.

Defendants contend that 402(a) (23) should be narrowly construed. They interpret it as being primarily aimed at raising a state's standards of need and as not controlling a state's levels of benefits to AFDC recipients. In support of this construction of the statute, defendants rely upon the position of HEW as expressed in its amicus brief filed in Lampton v. Bonin, 299 F.Supp. 336 (E.D.La.1969) and the implementing regulation of HEW which would permit a state to make downward adjustments in the amount of AFDC payments through the device of "ratable reductions"— *i. e.,* percentage reductions applied to the standard of need. 45 C.F.R. § 233.20(a) (2) (ii), 34 Fed.Reg. 1394 (1969).

This Court disagrees and holds that a broader construction of 402(a) (23) is required by language, statutory history and good sense.

Section 402(a) (23) plainly states that both the "amounts used by the State to determine the needs of individuals"— *i. e.,* the standard of need—and "any maximums that the State imposes on the amount of aid paid to families"— *i. e.,* the levels of benefits—be adjusted "to reflect fully changes in living costs since such amounts were established." The adjustment contemplated by 402(a) (23) is undoubtedly an upward one in view of the inflationary trend this country has experienced over the last two decades. The one judge who has heretofore considered this question at length has reached a similar conclusion. Lampton v. Bonin, 299 F.Supp. 336 (E.D.

La.1969) (dissent, setting out legislative history, the majority did not reach the question) ("Congress' intention to compel the states to raise ADC payments"). See also Williams v. Dandridge, 297 F. Supp. 450, (D.Md.1969) ("designed to increase benefits to keep pace with living costs").

This federal provision grew out of an attempt to reform the inequitable and unsatisfactory aspects of our present welfare system resulting from the inadequate and widely varying level of grants among the states. The solution first proposed by HEW would have required all states to meet in full their own need standards and to adjust payments annually so as to maintain payments at the 100% level despite intervening inflationary price rises. Congress put off enacting any basic change to allow further study and consideration of alternatives. At the same time, it did take an interim step, a holding action against further deterioration in levels of benefits.

 Section 402(a) (23) embodies that interim and temporary solution. It creates a floor under present levels of benefits by prohibiting future cuts in welfare payments and by requiring that all states provide at least one increase by July 1, 1969 to at least partially compensate for the rise in the cost-of-living.

As already noted, section 402(a) (23) grew out of an Administration proposal to require all states to pay 100% of need and to make annual cost-of-living adjustments beginning July 1, 1969. This proposal was originally embodied in the bill to amend the Social Security Act introduced in the House in 1967 at the request of the Administration. Section 202 of H.R. 5710, 90th Cong., 1st Sess. The bill ultimately reported out by the House Ways and Means Committee and passed by the House, H.R. 12080, contained no such provision.

The Administration renewed its request in the hearings before the Senate Finance Committee and proposed the following amendment to the House Bill:

[each state plan must] provide (A) effective July 1, 1969, for meeting * * all the need, as determined in accordance with standards applicable under the plan for determining need, of individuals eligible to receive aid to families with dependent children * * * and (B) effective July 1, 1969, for an annual review of such standards and * * * for updating such standards to take into account changes in living costs. Hearings Before the Committee on Finance, U.S. Senate, 90th Cong., 1st Sess., on H.R. 12080 at 635.

See also Id. at 716 (statement of HEW on its proposed amendments to H.R. 12080).

Secretary of Health, Education and Welfare John W. Gardner, in his testimony before the Committee in support of this amendment, specifically referred to the need to increase the level of benefits:

The House bill does nothing to improve the level of State public assistance payments. As things stand today, the States are required to set assistance standards for needy persons in order to determine eligibility—but they need not make their assistance payments on the basis of these standards. The result is that welfare payments are much too low in a good many states. * * *

We strongly urge you to adopt the administration's proposal requiring States to meet need in full as they determine it in their own State assistance standards, and to update these standards periodically to keep pace with changes in the cost of living. Hearings Before the Committee on Finance, U.S. Senate, 90th Cong., 1st Sess., on H.R. 12080 at 216.

Similar testimony was given by Undersecretary Wilbur Cohen:

It is this serious discrepancy between what the States themselves determine to be minimal need and the amounts they will actually pay that has led us to strongly recommend that States be

required to meet needs in full as they determine them. * * *

But it is not enough only to require the States to meet need standards. They must assure that these standards reflect current prices. Hearings Before the Committee on Finance, U.S. Senate, 90th Cong., 1st Sess., on H.R. 12080 at 259.

While Messrs. Gardner and Cohen referred only to state dollar maximums in the illustrations used in their testimony (*id.* at 255–260), it was clear from their statements and colloquy with those Senators present that concern was being expressed about any method used by the states to pay less than was indicated by their standards of need. Part of the record reads as follows:

SENATOR RIBICOFF. What happens, Mr. Cohen, with the people who receive payments so far below the standard?

MR. COHEN. Well, if a State does not pay its full standard, two things can happen. One is, as Senator Long indicated, that they may make up the difference from income from social security or earnings so that they still might meet the standard in those cases where an individual has social security or could work. But, I might say that out of the 2 million people who are old-age assistance recipients, the average age being 75, quite a number of them cannot work, although half of them do have social security benefits.

SENATOR RIBICOFF. I know, but you take all that into account in the standards that are being set. What they are receiving is not just a question of the amount they receive from the welfare agencies. You take into account all they receive. What happens to the child or the adult who receives so much less than what you consider or is considered a proper standard? How do they live?

MR. COHEN. They have to live on the lesser amount.

SENATOR RIBICOFF. How do they live?

MR. COHEN. They have to cut back on their food and clothing and other needs to live on the amount that the State gives them.

SENATOR RIBICOFF. Well, is not a study made or do not you know what happens to these people? I mean just what is happening to them?

MR. COHEN. Well, I think that the evidence shows—I do not have it immediately before me—that many of these children and these families grow up without adequate food, without adequate medical care, and certainly their whole aspirations for improving their educational status are stunted, and I think that the evidence from the State administrators when you hear them will bear that conclusion out.

SECRETARY GARDNER. It shows up most clearly, I think, in the medical data. You will find a higher incidence of just about every kind of medical disorder and physical handicap in these youngsters—malnutrition and everything else.

SENATOR RIBICOFF. Well, in looking to the cost to society ultimately, the people who are below standard cause a greater drain eventually upon what the society has to pay out in every conceivable way, is that not right?

SECRETARY GARDNER. No question about that, Senator.

MR. COHEN. I might add, Senator, just to give you a figure which I will come to later, that the average payment per child for the Nation as a whole is around $36 per month per child. That is the actual payment, which is a little bit more than $1 per day per child.

Now, I think, that this is an indication of the rather low level and inadequacy of payments that exist in the country as a whole. Some are higher and some are notably and substantially lower.

*Id.* at 258–59.

The bill reported out of the Senate Finance Committee, and passed by the Sen-

ate, reflected a compromise on this issue. The requirement that all states pay full need was rejected, but the second recommendation—that they be required to annually increase levels of payments to reflect changes in living costs—was contained in the Senate version. The bill is practically identical to 402(a) (23) except for a mandated annual cost-of-living adjustment:

> by July 1, 1969, and at least annually thereafter, the amounts used by the State to determine the needs of individuals will have been adjusted to reflect fully changes in living costs since such amounts were established, and that any maximums that the State imposes on the amount of aid to families will have been proportionately adjusted.

*See also* Senate Report No. 744, 1967 U.S.Code Cong. & Admin.News, p. 3133.

In the House-Senate Conference Committee, the requirement for annual increases was dropped; only one adjustment prior to July 1, 1969 was to be required. The Conference Committee Report explains:

> The new section [Senate amendment] also amended section 402(a) of the Act to require that by July 1, 1969, and annually thereafter, each State * * must adjust its standards so as to reflect current living costs and make proportionate adjustments in any maximums * * *.

> Under the [Conference Committee] agreement, the new section 402(a) provision (for adjustments to reflect living costs) would require States to make only one adjustment before July 1, 1969 * * * Conference Committee Report No. 1030; 1967 U.S.Code Cong. & Admin.News, p. 3209.

The language of the basic requirements of 402(a) (23) remained virtually unchanged throughout its legislative evolution. There is no hint from either committee that it intended to change the purpose of the section as expressed by Administration spokesmen. Hence,

there is no reason to believe that Congress failed to appreciate the import and plain meaning of the language in 402(a) (23).

### B. *Requirements of section 402(a) (23)*

#### 1. *Adjustment of Standards of Need*

Section 402(a) (23) simply requires that all states increase benefits once to keep pace with living costs. The only significant variation in the change required in different states is the percentage adjustment required, which depends on when, prior to January 2, 1968—the date 402(a) (23) became law—a state had last repriced its need standards. The more outdated the prices used to determine need, the greater the required adjustment.

All items comprising standards of need must be repriced. While items need not be added, no item previously included and still required by recipients may be omitted, else the effect of repricing would be nullified. The content of the repriced standards must be equivalent to that of the old. Any consolidation through a combining of items "may not result in a reduction in the amount of the standard." 45 C.F.R. § 233.20(a) (2) (ii), 34 Fed.Reg. 1394 (1969).

#### 2. *Increase in Levels of Benefits*

Section 402(a) (23) by its terms requires every state to increase its levels of payments by an amount sufficient to offset the rise in the cost of living. An upward adjustment of "any maximums that the State imposes on the amount of aid paid" automatically necessitates an increment in the amount of such aid.

Defendants contend that this requirement of increased levels of benefits does not apply to states such as New York, which have been paying full need or to states which employ precentage reduction systems. "Maximums," according to defendants, is a word of art in welfare law jargon which refers sole-

ly to dollar maximums and should be so construed within the meaning of the statute.

This argument is not persuasive. Section 402(a) (23) speaks of "any maximum," not just dollar maximums. If a state pays 100% of need, a standard of need constitutes both the maximum and the amount of aid paid. Repricing the standard of need serves, without more, to increase the level of payments. Both the creation and the reduction of dollar maximums are equal evasions of the statute.

The invalidity of this leg of defendant's argument can be illustrated by a hypothetical. The standards of need in State X and State Y are $200 per month. State X pays full need, or $200, while State Y imposes a dollar maximum of $100. The cost of living has risen 10% in both states. Under defendants' interpretation of 402(a) (23), State Y would have to increase its monthly payments to $110, while State X could lawfully reduce them to $100, or even $50.

▮▮▮ Section 402(a) (23), applies in the same manner to a percentage reduction system. The maximum which must be proportionately adjusted is not, as defendants would have us believe, the number representing the percentage reduction but, rather, the dollar figure resulting from the application of the percentage to a family's need as determined by the state's standard of need.

For example, if a state had a standard of need of $100, and paid 80% of need, the recipient would receive $80. If the need standard were now raised to $120 to reflect a rise in living costs, and the state continued to pay 80%, the recipient would receive $96. The rise in living costs would thus be reflected in increased aid to the recipient.

▮▮▮ We do not decide whether section 402(a) (23) precludes a state from converting to a "flat grant system" by averaging out all the special grants across the state and then adding this figure to that of the basic recurring grant, or by including all items previously covered by special grants as part of the regular grant, or by some other technique. Nor do we now decide whether any flat grant system discriminating against large families or families with older children would be invalid. *But cf*. Westberry v. Fisher, 297 F.Supp. 1109 (D.Me. 1969) (state regulation invalid if "families with a large number of dependent children receive less favorable treatment under Maine's AFDC program than families with a small number of dependent children"). All we need now decide is that section 402(a) (23) precludes a state from making changes resulting in either reduced standards of need or levels of payments. *Cf*. 45 C.F.R. § 233.20 (a) (2) (ii), 34 Fed.Reg. 1394 (1969) (consolidation of the standard of need "may not result in a reduction in the content of the standard").

## C. *HEW Implementing Regulation*

▮▮▮ "The interpretation * * * by those charged with its administration must be given weight by courts faced with the task of construing the statute." Zemel v. Rusk, 381 U.S. 1, 11, 85 S.Ct. 1271, 1278, 14 L.Ed.2d 179 (1965). But an administrative interpretation is by no means decisive when it departs from the meaning of the language and purpose of the statute; "deference" is all that is required. Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965); United States v. American Trucking Ass'n, Inc., 310 U.S. 534, 543, 60 S.Ct. 1059, 84 L.Ed. 1345 (1940); Haggar Co. v. Helvering, 308 U.S. 389, 394, 60 S.Ct. 337, 84 L.Ed. 340 (1940). *See* cases collected in Williams v. Dandridge, 297 F. Supp. 450 (D.Md.1969) (supplemental opinion). Any HEW regulation or interpretation "inconsistent with the controlling federal statute" may not be relied upon to justify denial of AFDC benefits. King v. Smith, 392 U.S. 309, 333, n. 34, 88 S.Ct. 2128, 2141, n. 34, 20 L.Ed.2d 1118 (1968); Williams v. Dandridge, 297 F.Supp. 450 (D.Md.1969) (supplemental opinion).

HEW agrees that the pricing of the need standard must be updated and that maximums must be appropriately adjusted. However, if a state has insufficient funds to meet need in full under the adjusted standard, HEW would permit it to pay to recipients only a given percentage of the adjusted standard of need. Its regulation provides that a state AFDC plan must:

> provide that by July 1, 1969, the State's standard of assistance for the AFDC program will have been adjusted to reflect fully changes in living costs since such standards were established, and any maximums that the State imposes on the amount of aid paid to families will have been proportionately adjusted. In such adjustment a consolidation of the standard (i. e., combining of items) may not result in a reduction in the content of the standard. *In the event the State is not able to meet need in full under the adjusted standard, the State may make ratable reductions* in accordance with subparagraph (3) (viii) of this paragraph [adjustments must be uniform statewide]. Nevertheless, if a State maintains a system of dollar maximums, these maximums must be proportionately adjusted in relation to the updated standards. 45 C.F.R. § 233.20(a) (2) (ii), 34 Fed.Reg. 1394 (1969) (emphasis supplied).

Defendants do not contend that section 131–a establishes any ratable percentage reductions of grants applied to the standard of need. "Section 131–a," they insist, "provides for the full standard of need." Memorandum of Law in Support of Defendants' Motion for Summary Judgment, p. 22. New York will continue to purport to pay on the basis of 100% of its standard of need. *Id.* at 23. The validity of the escape route for section 402(a) (23) supplied by the regulation is thus not formally before the Court.

Nevertheless, since this regulation provides the underlying foundation for defendants' position and since the under-scored portion of it cannot stand in the face of our interpretation of 402(a) (23), we feel obligated to briefly consider the regulation's validity. Were HEW correct in its assertion that 402(a) (23) can be easily circumvented by a mere technical adjustment of theory and figures and that it does not impair a state's freedom to set any levels of payments it chooses—so long as the proper verbiage is used in the state's statutes—we would be reluctant to seriously consider invalidating section 131–a. We are, after all, not playing a legislative word game but dealing with the allocation of tens of millions of dollars in tax receipts and with the well-being of a nearly million New York citizens.

Our analysis of the plain meaning of section 402(a) (23) and its legislative history and our construction of "maximums" within the meaning of the statute are equally relevant here and need not be repeated. Only three additional points need be made.

First, it seems an exercise in sophistry to infer, as does HEW, that states are free to do what they will with percentage reductions since 402(a) (23) does not specifically refer to them and the percentage figure itself need not be increased. *See* Lampton v. Bonin, 299 F. Supp. 336 (E.D.La.1969) (dissent; majority did not reach issue). As noted above, the number representing the percentage reduction is not the maximum to be "proportionately adjusted." Moreover, since the level of payments is automatically adjusted so long as the standard of need is updated and the percentage is kept constant, Congress' failure to mention percentage reductions is easily explainable by the fact that "there simply was no need to in order to achieve the desired increases." Id. at 354.

Second, to permit ratable reductions in the manner suggested by HEW would nullify the Congressional intent to increase the level of benefits and would render the statute virtually meaningless. A state could avoid increasing payments

by merely lowering the percentage figure or, if it had not been a percentage reduction state, by adopting a percentage system. Compliance with 402(a) (23) could be secured by a mere administrative adjustment of numbers without effecting any substantive change. States would be able to set any levels of payments—the identical position they were in prior to the enactment of 402(a) (23). This is highlighted by the very example put forth by HEW to illustrate its position:

> The fact that section 402(a) (23) does not affect percentage reductions *allows States to retain considerable flexibility* as to the amount of their assistance payments. We return to our example where a State with a need standard of $100 paid 80% of need, and the recipients received $80. Because of a 20% rise in living costs, the State's need standard is raised to $120. Such a State could now pay 66⅔% of need, and the recipients would still receive $80. Or the State could pay 100% of need, or 80%, or 50%, according to the available funds. States which formerly paid 100% of need might now change and pay a lesser percentage. States with a system of maximums might in addition compute payments on the basis of a percentage of need. HEW Amicus Brief submitted in Lampton v. Bonin, at page 10 (emphasis supplied).

"Nullification" rather than "flexibility" is a more apt word for such an interpretation.

Finally, were HEW correct, not only will assistance not be increased as Congress intended, but the implementing regulation, by encouraging states to switch to percentage reduction systems, is likely to lead to lower payments to present welfare recipients. The net result, under a percentage reduction system, of raising the standard of need without a concomitant increase in available funds, is to increase the number of persons eligible for relief at the expense of those already on relief. It is inconceivable that Congress intended the most poverty stricken members in our society to pay the added cost of those newly added to the AFDC rolls.

## VII. CONCLUSION

 As a participant in the AFDC program, New York may not breach "its federally imposed obligation to furnish 'aid to families with dependent children * * * with reasonable promptness to all eligible individuals * * *.'" King v. Smith, 392 U.S. 309, 333, 88 S.Ct. 2128, 2141, 20 L.Ed.2d 1118 (1968). The state's plan "must conform with the several requirements of the Social Security Act." *Id.* at 317, 88 S.Ct. at 2133. One of the federally imposed conditions—resulting from enactment of section 402(a) (23)—is that participating states not reduce either standards of need or levels of benefits below those in force on January 2, 1968 as revised to reflect cost-of-living increases between that date and July 1, 1969. Any "state law or regulation inconsistent with such federal terms and conditions is to that extent invalid." *Id.* at 333, n. 34, 88 S.Ct. at 2141; Solman v. Shapiro, 300 F.Supp. 409 (D.Conn.1969); Westberry v. Fisher, 297 F.Supp. 1109 (D.Me.1969) (invalidity of maximum grant regulations); Dews v. Henry, 297 F.Supp. 587 (D.Ariz.1969); Williams v. Dandridge, 297 F.Supp. 450 (D.Md.1968).

We do not hold that New York "must appropriate additional funds to support its participation" in the AFDC program. Williams v. Dandridge, 297 F.Supp. 450 (D.Md.1968). We hold only that if it participates it must comply with federal law.

 There is a substantial possibility that section 131-a of the New York Social Services Law does reduce both the standards of need and levels of benefits in violation of federal law. If irreversible steps to implement section 131-a have been taken or changes on actual payments pursuant to section 131-a have

been made and the section is then declared to be, invalid, irreparable harm to recipients of AFDC will result. On balance, the probability of harm to plaintiffs from a failure to grant a preliminary injunction far outweighs possible harm to the state in granting one. Accordingly, the parties will submit proposed orders for a preliminary injunction by 4:30 P.M. on Friday, May 16, 1969. The attorneys for the parties should be present in chambers at that time so that arrangements for further proceedings can be made.

## VIII. SOME QUESTIONS OF FACT

In preparation for the meeting in chambers, the attorneys should consider the questions of fact listed below and be prepared to raise any additional issues they desire the Court to consider.

1. What is the total average grant (recurring and special) per family of each size?
 (a) New York City
 (b) New York State outside of New York City
 (c) New York State as a unit

2. What is the average amount that a family of each size receives in special grants?
 (a) New York City
 (b) New York State outside of New York City
 (c) New York State as a unit

3. What is the number of families of each size receiving AFDC assistance?
 (a) New York City
 (b) New York State outside of New York City
 (c) New York State as a unit

4. What is the number of families of each size with an oldest child above the mean for that size family?
 (a) New York City
 (b) New York State outside of New York City
 (c) New York State as a unit

5. The same question as (4) as regards families of each size with a child below the mean age.

6. What is the total number of families receiving increased grants under section 131–a (taking into account cyclical and special grants available under present law)? What is the total dollar amount of the increases? What is the average increase per family (broken down into families of each size)?
 (a) New York City
 (b) New York State outside of New York City
 (c) New York State as a unit

7. The same question as (6) as regards decreases.

8. Is it contemplated that any persons presently eligible as AFDC recipients will be declared ineligible for such aid under section 131–a?

9. Why do the levels of payments in section 131–a increase by the same amount as the size of the family increases?

10. What is the number of AFDC recipients in each of the counties comprising the present SA–1 schedule other than the five New York City counties?

11. What effect will the new Food Stamp program have on AFDC recipients? Who will be eligible? Will it be applicable throughout New York State?

12. The same question as (11) as regards the Day Care Center program.

13. What other programs, if any, are to be initiated or expanded to meet AFDC needs? When?

14. What amounts were appropriated in the budget passed March 29, 1969 for each of the forms of categorical aid?

15. What amounts were appropriated in the Supplemental Budget passed May 2, 1969 for each of the forms of categorical aid?

16. How were the figures referred to in questions (14) and (15) determined,, i. e., what statistical bases were employed in reaching the final dollar amounts in each of these categories?

17. What were the total dollar amounts appropriated in the 1968–69 fiscal year for AFDC in (a) the Local Assistance Fund Budget adopted in 1968, and (b) all deficiency budgets adopted in the 1968–69 fiscal year?

18. Does the difference of $23,684,000 between the proposed budget and the budget actually adopted as regards the AFDC appropriation represent administrative savings or partial savings from the abolition of special grants? What figures were used to answer this question?

19. Has there been any further correspondence between the state and HEW regarding the AFDC program?

## SUPPLEMENTAL OPINION

In this Court's opinion granting plaintiffs' motion for a preliminary injunction, we held that section 402(a) (23) accomplishes two results. First, it creates a floor under present levels of benefits in AFDC by prohibiting cuts in welfare payments. Second, it requires that all states provide at least one increase in both standards of need and levels of benefits by July 1, 1969 to at least partially compensate for the rise in the cost-of-living.

There is "no genuine issue as to any material fact" on the question whether section 131–a of New York's Social Services Law meets this dual requirement. The statistical data supplied by both defendants and plaintiffs, while differing in some particulars, is consistent so far as it is legally relevant.

The change to the flat grant system—long favored by some as a more enlightened method of public assistance —has been used as a subterfuge to enact drastic cuts in both standards of need and levels of benefits to meet the exigencies of a state budget in violation of the Congressional mandate embodied in section 402(a) (23). Accordingly, plaintiffs' motion for summary judgment must be granted.

Set out below are the Court's findings of fact and conclusions of law:

1. The schedules contained in section 131–a effect a substantial reduction in standards of need and levels of benefits.

The estimates submitted by the state are that 111,899 welfare familites will receive increases in benefits under section 131–a; that the total monthly amount of these increases is $1,716,910; and that the average monthly amount of the increase per family is $15.34. The decreases under section 131–a are greater in all respects: 141,313 families will receive decreases; the total monthly amount of these decreases is $3,420,441; and the average monthly decrease is $24.-20. These figures are in the table below:

| | Number of Families | Total Monthly Amount | Monthly Average Change |
|---|---|---|---|
| Increases | 111,899 | $1,716,910 | $15.34 |
| Decreases | 141,313 | $3,420,441 | $24.20 |

These statistics reflect only the changes in the regular recurring grant plus, for New York City only, the amount of the cyclical grant. They do not include the loss to dependent children of all the special grants—available under present law because they have heretofore been deemed by the state essential to children's welfare; these special grants are abolished under section 131-a to achieve a further reduction in state expenditures of many millions of dollars.

Approximately 80% of the AFDC recipients in the state reside in New York City. The figures for New York City are set out below:

| | Number of Families | Total Monthly Amount | Monthly Average Change |
|---|---|---|---|
| Increases | 79,838 | $1,091,471 | $13.67 |
| Decreases | 110,908 | $2,772,313 | $25.00 |

———◆———

Plaintiffs have submitted statistics which attempt to compute the effect of eliminating non-recurring special grants for New York City residents. With this new variable included, the number of families receiving increases in New York City under section 131-a drops to a mere 245 and the total monthly amount of these increases is $530 for all of New York City. Only a very rare class of New York City families—those with six or seven children, the oldest of whom was five years of age—would receive any increase at all. Conversely, the number of families suffering decreases rises to approximately 173,900 and the aggregate dollar amount of their decreases totals approximately $5,950,000 per month.

Set out below is a table comparing the total average grant (recurring and special) per family in New York City under present law and under the section 131-a schedule:

| Family Size | Present Law | Section 131-a |
|---|---|---|
| 2 | $137.42 | $116 |
| 3 | $197.13 | $162 |
| 4 | $250.84 | $208 |
| 5 | $315.55 | $254 |
| 6 | $352.26 | $297 |
| 7 | $418.97 | $340 |
| 8 | $463.68 | $383 |
| 9 | $505.39 | $426 |
| 10 | $571.10 | $469 |

———◆———

2. The elimination of special grants constitutes a reduction of standards of need and levels of benefits.

3. The elimination of the cyclical grant for New York City residents constitutes a reduction of standards of need and levels of benefits.

4. The elimination of differentiated larger grants for the needs of families with older children and the failure to

provide for families with children above the mean age of the oldest child in families of a given size constitutes a reduction of standards of need and levels of benefits.

5. The transfer of seven counties which are presently included in the SA–1 schedule to a lower schedule constitutes a reduction of standards of need and levels of benefits for AFDC recipients of these counties. The small upward adjustment of the schedules of payments in some counties outside New York City promulgated administratively pursuant to the amendment to section 131–a discussed in the *per curiam* opinion of the three-judge court, Rosado v. Wyman, 304 F. Supp. 1354 (E.D.N.Y.1969), does not offset the reductions; the new schedules constitute a reduction in current standards of need and levels of benefits.

6. Some persons who presently receive supplementary AFDC benefits will no longer be eligible for assistance under section 131–a.

7. New public assistance programs instituted by New York State will not offset the reductions effected by section 131–a.

(a) Food Stamp Program. The Food Stamp Act provides that participating states shall not decrease welfare payments as a result of participation in this program. 7 U.S.C. § 2019(d). The state concedes that "Neither the donated commodities or food stamps may be deemed or construed to be public assistance in whole or in part or a substitute therefor. Participation in either program by recipients or others is completely voluntary."

In any event, federal funding is not yet certain and in many instances all that will be involved is a change from the Commodity Distribution Program. No projected food stamp program can offset the reductions in benefits described above.

(b) Day Care Center Program. This program involves only a handful of recipients. It cannot serve as a substitute for AFDC payments, and it will be some time before the program is significantly

expanded. No projected day care center program can offset the reductions in benefits described above.

(c) Other Programs. Such programs as the proposed Work Incentive Program are of minor significance and have little effect on the issues before us. Neither this program nor any other projected program nor any combination of such programs can offset the reduction in benefits described above.

8. The Governor's 1969–70 Proposed Budget contained an AFDC appropriation request of $321,125,000 as a part of a total Local Assistance Fund request of $1,040,014,000. In the March 29, 1969 budget bill, the legislature appropriated only $912,014,000 to the Local Assistance Fund—a reduction of $128,000,000. Of this sum, $290,459,000 was earmarked for AFDC—a reduction of approximately $30,000,000 or 10%. When the $5,000,000 amount in the Governor's Proposed Budget for 1969 cost-of-living increases is eliminated, the reduction for AFDC is approximately $25,000,000. Since the state's share is approximately 30%, the decrease in total AFDC payments under the New York State program is no less than $75,000,000.

Defendants state that the $25,000,000 reduction in the state's share of AFDC costs "is the result of the allowance schedules in Section 131–a including the elimination of special grants, the revision of Section 139–a, addition of Section 132–a and any other changes made by Chapter 184, Laws of 1969." However, no substantial portion of the savings could have been expected to result from changes in the welfare law other than section 131–a. The $25,000,000 reduction represents almost entirely savings in AFDC grants.

9. The additional $42,000,000 reduction in the AFDC appropriation contained in the May 2, 1969 Supplemental Budget was enacted in contemplation of increased federal funds and will not affect AFDC payments.

Plaintiffs' motion for summary judgment is granted.