Shirley **LAMPTON** and Luethel Williams, individually and on behalf of their minor children, and on behalf of all other persons similarly situated, Plaintiffs,

v.

Garland L. **BONIN**, individually, and in his capacity as Commissioner of Public Welfare of the Louisiana State Board of Public Welfare; Camille Adams, individually, and in his capacity as Chairman of the Louisiana State Board of Public Welfare; John J. McKeithen, individually, and in his capacity as Governor and Ex-Officio member of the Louisiana Board of Public Welfare; Lawrence Morel, Howard Gruenberg, J. Grady Madden, Mary Lou Winters, Joseph D. Hair, Jr., John D. Sittig, and Matt Milam, Jr., individually, and in their capacities as members of the Louisiana State Board of Public Welfare; and Doris Culver, individually and as Director of the Orleans Parish Department of Welfare, Defendants.

Civ. A. No. 68-2092.

United States District Court
E. D. Louisiana,
New Orleans Division.
July 16, 1969.

Jeffrey B. Schwartz, T. A., Richard A. Buckley and Robert Glass, New Orleans, La., for plaintiffs.

Jack P. F. Gremillion, Atty. Gen., Baton Rouge, La., William P. Schuler, 2nd, Asst. Atty. Gen., Henry J. Roberts, Jr., Asst. Attys. Gen., Dorothy D. Wolbrette, New Orleans, La., Horace Pepper, Gen. Counsel, La. Dept. of Public Welfare, Baton Rouge, La., St. John Barrett, Acting Gen. Counsel, Joel Cohen, Asst. Gen. Counsel, Myron Berman, Frances

White, Dept. of Health, Education & Welfare, Washington, D. C., Louis C. LaCour, U. S. Atty., New Orleans, La., for defendants.

Before WISDOM, Circuit Judge, and CASSIBRY and COMISKEY, District Judges.

WISDOM, Circuit Judge:

This case began as a class action seeking a declaratory judgment and injunctive relief to prevent the Louisiana Department of Public Welfare from making a ten percent reduction in aid to families with dependent children.[1] This Court discussed the factual and legal issues in an opinion by Judge Comiskey issued April 15, 1969, 299 F.Supp. 336; Judge Cassibry dissented. Louisiana's welfare appropriation, as set out in Act 9 of 1968, was effective until June 30, 1969. July 1, 1969, was the deadline fixed by Congress for action by the states to adjust their standard of need for dependent children to reflect fully changes in living costs since the adoption of the standard. See Section 402(a) (23) of the Social Security Act, 42 U.S.C. 602(a) (23). The Louisiana legislature was to begin its fiscal session in May 1969. Accordingly, a majority of the Court held that it was premature to reach the merits of the action. In our earlier opinion we said: "We cannot say at this time whether or not Louisiana will devote additional funds to ADC for the new cost of living increases in the new appropriations bill. We certainly cannot tell what Louisiana will do after July 1 from an appropriation bill which expires on June 30." The Court retained jurisdiction of the case.

July 1 has come and gone. The Louisiana legislature met and adjourned without increasing the level of payments to families with dependent children. The Department raised its standard of need to reflect a twenty percent rise in living costs—but reduced its actual ADC payments. It did so by abolishing its system of dollar maximums and by instituting a ratable reduction of 42.13 percent against each recipient family's budgetary deficit.[2]

The plaintiffs contend that this action of the Department violates Section 402 (a) (23) of the Social Security Act. A majority of the court, however, feel compelled to hold that if the State of Louisiana decides to supply only half of the amount dependent children admittedly need for a bare subsistence, the State may do so without violating the Act.

\* \* \*

Under Title IV of the Social Security Act, Congress, through the Department of Health, Education, and Welfare (HEW) contributes federal funds to the states for their programs of furnishing Aid to Families with Dependent Children (AFDC or ADC). Federal aid in Louisiana amounts to nearly eighty percent of the total costs of the ADC program.

Section 402(a) (23) of the Act, 42 U.S.C. § 602(a) (23), one of the 1967 amendments to the Act, provides, as follows:

"A state plan for aid and services to needy families with children must \* \* \* provide that by July 1, 1969, [1] the amounts used by the State to determine the needs of individuals will have been adjusted to reflect fully changes in living costs since such

---

1. According to Garland L. Bonin, the Commissioner of Public Welfare, the sudden rise in the ADC case load resulted from the Supreme Court's decision in King v. Smith, 1968, 392 U.S. 309, 88 S.Ct. 2128, 20 L.Ed.2d 1118. This ruling had the effect of compelling Louisiana to make ADC payments to families previously excluded from receiving such grants under the "man in the house policy". Under that policy payments had been withheld from families

in which the parent and a member of the opposite sex were not married but either lived together as man and wife and maintained a common household, or had continuous intimate relations even if they did not maintain a common household.

2. "Budgetary deficit" means the difference between a family's need and the family's income.

amounts were established, and [2] any maximums that the State imposes on the amount of aid paid to families will have been proportionately adjusted."

The question for decision is whether the second clause of this provision, as a condition to HEW approval of federal participation in the ADC program, prohibits the State from decreasing its ADC payments and, in addition, requires the State to increase its payments to reflect fully the changes in living costs since the level of payments were established.

Until July 1, 1969, the Louisiana Department of Public Welfare used dollar maximums for payments to recipients. For example, a mother and a dependent child were limited to $80 a month. A family of five or more received maximum aid of $163 a month.

Just prior to July 1, 1969, the Department redetermined the *standard of need* and increased it by 20 percent to reflect the increase in the costs of living up to May 1968.[3] All agree that the first clause of Section 402(a) (23) requires an increase *in the standard of need.* All also agree that the State may give less than 100 percent of the standard of need. The dispute is over the meaning of the clause that refers to "any maximums".

At the time the Department increased the standard of need, it abolished dollar maximums. The defendants contend, therefore, and so the statute seems, literally, to say, that the State need not increase the ADC payments to reflect the rise in the costs of living when there are no longer any arbitrary maximums to adjust. Here, instead of making upward adjustments, the State made a ratable reduction in its ADC payments. The Department determined the budgetary deficit of each recipient family and made a ratable reduction against each budgetary deficit of 42.13 percent. The payments

to be made, therefore, will amount to only 57.87 percent of the budgetary deficits. This reduction was made necessary by the fact that the Louisiana Legislature, which has recently concluded its fiscal session, rejected the Department's budget request for $17,320,000 and appropriated only $9,043,000 for the State's 1969–1970 fiscal year. (The federal matching share now added to the state share of ADC grants for Louisiana's appropriation is $38,800.00.)

We recognize the merit in the plaintiffs' arguments. The dissenting opinion ably supports the plaintiffs' position. So, too, do two decisions: Rosado v. Wyman, E.D.N.Y.1969, 304 F.Supp. 1356; Jefferson v. Hackney, N.D.Tex.1969, 304 F.Supp. 1332. The plaintiffs contend, in effect, that the defendants' construction of the statute puts Congress in the old shell game: now you see it, now you don't. First, Congress requires the States to redetermine need and maximums to reflect rising costs of living. Then, Congress permits the States to make deep cuts in actual payments far below the level of need and the prior payments without taking into consideration rising costs of living. Moreover Congress gave the states eighteen months to make these adjustments in order to allow the state legislatures an opportunity to convene in their regular sessions and make the appropriate adjustments in their AFDC programs. This is a semantic ploy or exercise in bookkeeping that Congress would not engage in, the plaintiffs say. The fact is, however, that the statute is clear on its face. There are doubts as to its meaning only because Section 402(a) (23) produces pitifully inadequate results in a period of rising costs of living and skyrocketing demands on the States to meet all their budgetary deficits.

3. The Department based this increase on figures supplied by the Bureau of Business Finance of Louisiana State University. These figures are derived from statistics reflecting the cost of living in six Louisiana cities. The Department of Labor Index showing the increase in the costs of living is not based on figures derived from the costs of living in any Louisiana city.

There is no reason now to use May 1968 figures. The May 1969 figures show an increase of about 23 percent.

The determination of a *standard* of need is different from *meeting* the need. Every dependent family in Louisiana knows this now, whether or not the family comprehends the reason for the state's reducing its grants. If Congress had intended to require the states to put a floor on current levels of aid and to increase payments to reflect the increase in the costs of living, it would have been obvious to Congress that such requirements would cost the federal government and the states several hundred million dollars and perhaps as much as five hundred million dollars. A bill clearly having this effect would have been a burning issue on the floors of the House and the Senate.

Section 402(a) (23) was enacted by section 213(b) of P.L. 90–248, 81 Stat. 898 in the committee reports, most of the attention was given to Section 213 (a). That section amended the "adult" titles to allow states at their option to disregard not more than $7.50 a month. Thus, the Senate Report, under the heading "Increasing the benefits for the aged", discussed the provision for the adult categories at some length, then added noncommittally,

> "States would be required to price their standards used for determining the amount of assistance under the AFDC program by July 1, 1969 and to reprice them at least annually thereafter, adjusting the standards and any maximums imposed on payments to reflect changes in living costs." S.Rep. No. 744, 90th Cong., 1st Sess. 170 (1967), U.S.Code Cong. & Admin. News 1967, p. 3007.

In the summary of principal provisions of the bill, the report refers only to the provision for the adult categories, and is silent on the ADC provision. S.Rep. No. 744, 90th Cong., 1st Sess. 29 (1967). The Conference Report, under the heading "Increasing income of recipients of assistance", reflected only the changes that had been made in Conference. On ADC, it stated

> "Under the agreement, the new section 402(a) provision (for adjustments to reflect living costs) would require States to make only one adjustment before July 1, 1969, after which date the provision would not apply." H.R. Rep.No.1030, 90th Cong., 1st Sess. 63 (1967), U.S.Code Cong. & Admin. News 1967, p. 3209.

The "Summary of Social Security Amendments of 1967", a Committee Print of a Joint Publication of the Senate and House Committees (90th Cong., 1st Sess., December 1967) referred to the contents of section 213 under the heading "Pass Along", mentioning only the amendment to the adult categories, without any reference to the ADC provision. It is also significant that the cost estimates on the bill as agreed to by the Conference Committee (Table 5 of the Joint Publication, page 28) did not reflect anything for section 213. Clearly, no great cost effect was anticipated.

Senator George McGovern of South Dakota made the modest proposal that ADC aid be increased by four dollars a month to each recipient. This little proposal would have cost approximately $80 million annually in federal funds and $136 million annually in non-federal funds. Senator Russell B. Long of Louisiana opposed the amendment on the ground that it would place too heavy a financial burden on the states. His main concern was that he did not know where the states would get the additional funds to meet such a requirement. 113 Cong. Rec. S16964, (daily ed. Nov. 21, 1967).

The original Administration-HEW proposal to Congress distinguished between *"meeting need"* and *"determining need"*. The original proposal would have required the state to *meet* need in full as well as to update the amounts used to *determine* need, as follows:

> "each state plan must provide * * * effective July 1, 1969, *for meeting* * * * *all the need* as *determined* in accordance with standards applicable under the plan for determining need * * * and effective July 1, 1968, for an annual review of such standards and (to the extent prescribed by the Secretary) for updating such stand-

ards to take into account changes in living costs". Section 202 of H.R. 5710.

Congress rejected the proposal for *meeting* need, and retained only the provision that the standard used to *determine* need be updated.

Former HEW Secretary Gardner complained that

"the states are required to set assistance standards for needy persons in order to determine eligibility, but they need not make their assistance payments on the basis of these standards." (Senate Finance Committee Hearings, 90th Cong., 1st Sess., on H.R. 12080 at 216.)

Looking at the statutory language, the second clause of Section 402(a) (23) in terms applies only to maximums. The defendants and HEW point out that "maximums" is a term of art. In the field of social security law, so they say, "maximums" means dollar maximums; there is no such thing as "percentage maximums". The Act itself distinguishes between "maximums" and percentages. See Section 403, 42 U.S.C. 603(a) (1) (B). When, therefore, a state abandons its maximums, it is free to make ratable reductions. (The plaintiffs, however, make the point that any dollar maximums may be translated into a percentage and vice versa.)

Maximums have been under severe constitutional attack. See Williams v. Dandridge, D.Md.1968, 297 F.Supp. 450; Dews v. Henry, D.Ariz.1969, 297 F.Supp. 587; Collins v. State Board of Social Welfare, 1957, 248 Iowa 369, 81 N.W.2d 4; Westberry v. Fisher, D.Me.1969, 297 F.Supp. 1109. In Westberry v. Fisher, Judge Edward Gignoux, after a careful review of the law, held that Maine's regulations establishing maximum grants violated the Equal Protection Clause of the Fourteenth Amendment:

"The classifications created by the Maine maximum grant and maximum budget regulations bear no reasonable relation to the purposes of the federal and state AFDC program * * * The only apparent purpose to be served by the challenged regulations is to protect the state treasury against the burgeoning costs of public welfare * * But it may not be accomplished by arbitrarily singling out a particular class of persons to bear the entire burden of achieving that end * * *. We see no other rational basis for the distinction made by these regulations between dependent children in small families and dependent children in large families, and the State of Maine has suggested none. * * *." 297 F. Supp. 1109 at 1114, 1115.

Judge Gignoux "emphasize[d] that Maine is free to take reasonable steps, as other states have done, to allocate on a non-discriminatory basis its resources available for AFDC". He pointed out that seven states provide "simply for percentage reductions or similar nondiscriminatory methods for limiting need standards or grants".

In view of Westberry v. Fisher, the Louisiana Department of Public Welfare must be credited with having eliminated its maximums because of serious doubt as to their validity and not as a backhanded way of avoiding the necessity of increasing the maximums (payments) to reflect the rise in cost of living.[4]

The premise that Section 402(a) (23) is meaningless unless the ADC pay-

---

4. In addition, as pointed out in Williams v. Dandridge, D.Md.1968, 297 F. Supp. 450, a system of maximum grants conflicts with the AFDC policy of preserving the family as an intact unit. "(T)he maximum grant regulation provides a powerful economic incentive to break up large families by placing 'dependent children' in excess of those whose subsistence needs, when added to the subsistence needs of other members of the family, exceed the maximum grant, in the homes of persons included in the class of eligible relatives (see 42 U.S.C. § 606(a) (1964 ed., Supp. 11)). If this is done, the pernicious effect of the maximum grant regulation is avoided, but the purpose of keeping them in their own home is defeated."

ments are adjusted upward, fails to take into consideration that one of the effects of Section 402(a) (23), as interpreted by HEW and defendants, is to make additional persons eligible for AFDC payments as well as for concomitant services provided not only for the child but also for his parents and family members. An examination of the many lengthy provisions added to Section 402 by the 1967 Social Security Amendments shows that Congress's major concern was the provision of family counseling and rehabilitation services, work incentives, and family planning programs to reduce out-of-wedlock births, for all persons in the family, in order to promote self-support and child development and to strengthen family life. See also U.S. Code Cong. & Admin.News, Vol. 2, 90th Cong., 1st Sess. 1967, p. 2837. By making those with marginal incomes eligible for AFDC by raising the standard of need, more persons would be eligible for such services, which Congress considered vital to cut down in the long run the numbers dependent on welfare.

The construction HEW places on the statute tips the scales in favor of the defendants.[5] HEW is the agency charged with administering the programs under the statute.[6] And, presumably, HEW sponsored or opposed the changes in the Act that became the 1967 amendments. The pertinent HEW regulation specifically allows a state to make "ratable reductions" in the "event the State is not able to meet need in full under the adjusted standard".

"In the AFDC plan, provide that by July 1, 1969, the State's standard of assistance for the AFDC program will have been adjusted to reflect fully changes in living costs since such standards were established, and any maximums that the State imposes on the amount of aid paid to families will have been proportionately adjusted. In such adjustment a consolidation of the standard (i. e., combining of items) may not result in a reduction in the content of the standard. In the event the State is not able to meet need in full under the adjusted standard, the State may make ratable reductions in accordance with subparagraph (3) (viii) of this paragraph. Nevertheless, if a State maintains a system of dollar maximums, these maximums must be proportionately adjusted in relation to the updated standards." 45 C.F.R. 233.20(a) (2) (ii), 34 F.R. 1394 (1969).

\* \* \*

The Social Security Act is an example of cooperative federalism. As the Supreme Court said in King v. Smith, 1968, 392 U.S. 309, 318, 88 S.Ct. 2128, 20 L. Ed.2d 1118:

"There is no question that States have considerable latitude in allocating their AFDC sources, since each State is free to set its own standard of need and to determine the level of benefits by the amount of funds it devotes to the program."

If Section 402(a) (23) should be read as prohibiting the states from reducing their current levels of ADC benefits and as requiring upward adjustments of payments, that provision would be a striking exception to the way the statute was originally designed to function. Such a departure from the principle expressed in King v. Smith would not be warranted without clear statutory lan-

---

5. At the Court's request, HEW filed an amicus brief. This brief and another filed in the Texas case, Jefferson v. Hackney, N.D.Tex.1969, 304 F.Supp. 1332, document HEW's position. HEW declined the Court's invitation to intervene as a party defendant.

6. Courts show great deference to the interpretation given a statute by the agency charged with its administration. See Zemel v. Rusk, 1965, 381 U.S. 1, 85 S.Ct. 1271, 14 L.Ed.2d 179; Udall v. Tallman, 1965, 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed. 2d 616; Power Reactor Development Corp. v. International Union of Elec., etc., 1960. 367 U.S. 296, 81 S.Ct. 1529, 6 L.Ed.2d 924.

guage supported by unmistakable legislative history.

The majority of this Court is just as unhappy about the result we reach as is the dissenting judge. In Jefferson v. Hackney the court held in favor of the dependent children but stayed the judgment sixty days to allow time for the Texas legislature to comply with the court's construction of Section 402(a) (23). Perhaps the State of Louisiana may find a way to make payments to dependent children that will at least furnish aid based on current levels plus the rise in the costs of living. If Section 402(a) (23) of the Social Security Act does nothing else, it spotlights the difference between the amount a state has determined to be the need of its dependent children and the amount its legislature has appropriated to meet the need along with federal funds. In Louisiana, on outdated figures, the difference is 42.17 percent.

The plaintiffs' suit for a preliminary and a permanent injunction is denied.

The State Department of Welfare is directed to adopt a standard of need that will reflect fully changes in living costs using the latest figures now available for properly determining living costs in Louisiana.

The motion to make the HEW an indispensable party is denied.

The Clerk shall issue a judgment in accordance with this opinion.

CASSIBRY, District Judge (dissenting):

Waving the banner of "cooperative federalism," with the accent on states' rights, and adopting an interpretation of section 402(a) (23) of the Social Security Act of 1935 that stresses the precise words of the statute to the exclusion of Congress' clear purpose in enacting it; that emasculates the meaning of the statute to the extent that it is rendered an absurdity, a nonentity, a futile exercise of the legislative will; and, most significantly, that ignores the urgent need for increased assistance payments which Congress sought to meet, this court casts aside plaintiffs' contention that section 402(a) (23) requires Louisiana to increase ADC grants. I must dissent.

The question for the court is what Congress meant when it added section 402(a) (23) to the Social Security Act, 42 U.S.C.A. § 602(a) (23) (Supp.1969), which requires that any state plan for Aid to Dependent Children (ADC) must:

provide that by July 1, 1969, the amounts used by the State to determine the needs of individuals will have been adjusted to reflect fully changes in living costs since such amounts were established, and any maximums that the State imposes on the amount of aid paid to families will have been proportionately adjusted.

In my dissenting opinion in Lampton v. Bonin, 299 F.Supp. 336, (E.D.La.1969) (hereinafter referred to as *Lampton I*), I found it necessary to consider this question and, after reviewing the language of the statute and the legislative history, concluded that Congress intended to require the states to increase ADC payments by the change in the cost of living since the existing level of payments was established. Nothing the majority say has made me change my mind; in fact, their inability to provide the statute some reasonable meaning only enhances my belief in the correctness of my original interpretation of the statute, not to mention its acceptance and refinement by Judge Weinstein in Rosado v. Wyman,[1]

1. June 6, 1969, the Court of Appeals for the Second Circuit, in a 2–1 decision, stayed the District Court's preliminary injunction restraining New York's Commissioner of Social Services from implementing and putting into effect reductions in ADC payments pending disposition of an appeal from Judge Weinstein's decision. June 23, 1969, the Supreme Court denied a writ of certiorari before judgment. 395 U.S. 826, 89 S.Ct. 2134, 23 L.Ed.2d 739. Inasmuch as jurisdictional questions complicate *Rosado*, the grounds for the stay are uncertain, and until publication of a written opinion, its issuance cannot be viewed as having any reflection on the merits.

304 F.Supp. 1356, (E.D.N.Y.1969), and the subsequent adherence of the three-judge district court in Jefferson v. Hackney, 304 F.Supp. 1332 (N.D.Texas 1969). But before restating the position taken in my previous dissent, I should first like to delineate the errors inherent in the majority's analysis of section 402 (a) (23), and dispel any notion that Congress primarily meant what the majority purport to find in the statute.

## I. SUGGESTED EFFECTS OF SECTION 402(a) (23)

The majority contend that section 402 (a) (23) is not meaningless, and has three possible effects apart from the increased payments contended for by plaintiffs.

### A. Increase the Standard of Need

One such effect is to increase the standard of need by the change in the cost of living so as to make additional persons (those with marginal incomes) eligible for ADC payments and concomitant social welfare services. This is certainly a laudable objective, well within the power of Congress, obviously an incidental side effect of section 402(a) (23), but cannot be what Congress principally had in mind when it enacted this particular amendment. This is amply evidenced by the majority's unsuccessful attempt to find support in the legislative history for some indication that Congress intended expanded eligibility as the purpose of the statute.

In support of this contention, the majority rely upon the other provisions enacted along with section 402(a) (23), and argue that inasmuch as these were meant to provide ancillary services in order to strengthen family life, section 402(a) (23) must do likewise. From this the majority conclude, without giving due consideration to the independent legislative history of section 402(a) (23), that Congress intended section 402 (a) (23) "to make additional persons

eligible for AFDC payments as well as for concomitant services." This argument must be rejected.

Section 402(a) (23) has a legislative history of its own, separate and apart from that of other provisions of the 1967 Social Security Amendments, and so long as its purpose, as revealed by this history, is not inconsistent with the other provisions and in need of reconciliation therewith, it must be judged alone. Further, because section 402(a) includes numerous unrelated ADC program requirements which states must fulfill if they are to be entitled to receive federal financial assistance, no basis exists for limiting the scope or intent of one such requirement by another unless they are in potential conflict with or overlap each other, which has clearly not been shown to be the case here.

In discussing the legislative history in order to find support for their position, the majority fail to consider that Congress enacted at the same time as section 402(a) (23), and in the very same bill, a limitation on federal matching funds, [1a] only recently repealed, whose intended effect was to induce the states to tighten their eligibility standards and reduce the number of individuals receiving ADC payments—the exact opposite of the intent which the majority seek to attribute to Congress by its passage of section 402 (a) (23). See Lampton I, *supra* 299 F. Supp. at 355, note 19; H.Rep.No. 544, 90th Cong., 1st Sess., at 110 (1967). Are we to assume, then, as the majority would have it, that Congress engaged in a tug-of-war with itself? Or are we to conclude, as is certainly more reasonable, that Congress did not legislate section 402(a) (23) in order to expand eligibility for ADC?

Finally, by suggesting that increased eligibility was one of Congress' primary concerns when it enacted section 402(a) (23), the majority go beyond the position maintained by HEW in support of the

---

1a. *See* section 208(b) of the 1967 Social Security Amendments, which added section 603(d) (1) of the Social Security Act, 42 U.S.C.A. § 603(d) (1) (Supp.

1969). *See also* Pub.L. 90–364, 82 Stat. 273 (1968), which delayed the effective date of the limitation until July 1, 1969.

defendants' position. For although HEW initially propounded this argument in its brief amicus curiae filed in connection with *Lampton I,* it was later dropped from its brief submitted in Jefferson v. Hackney, *supra,* and for the very good reason that Texas, following HEW's interpretation of the statute in 45 C.F.R. § 233.20(a) (ii), 34 Fed.Reg. 1394 (1969), applied its ratable reduction to the standard of need, rather than the budgetary deficit as in Louisiana, and thus reduced the number of persons eligible for ADC grants. That Louisiana chose to follow a different procedure, thus spreading its limited funds among a greater number of needy families, is of course immaterial to discerning Congress' intent regarding section 402(a) (23). What is material is that a state, consistent with this provision, may if it chooses, reduce the number of persons eligible for ADC payments.

In sum, we must conclude that while an increase in the standard of need would in most cases lead to an increase in the number of persons eligible to participate in the ADC program, this was not the sole or principal intent of Congress when it enacted section 402(a) (23).

*B. Elimination of Maximums*

As a second intended effect of section 402(a) (23), the majority suggest that Congress hoped to induce the states to eliminate the use of arbitrary dollar maximums restricting the size of assistance grants and to substitute other, more equitable forms of holding down welfare expenditures which effect all families proportionately, such as a ratable reduction system. To effectuate this purpose, the majority say Congress required in section 402(a) (23) that dollar maximums be increased proportionately to the change in living costs. Thus, according to their logic, a state is confronted with the choice of either increasing its maximums, and hence its payments, or abandoning its maximums and shifting to a system of ratable reductions.

No legislative history is cited in support of this proposition, because none

exists. At no time during consideration and passage of the 1967 Amendments did Congress ever express any interest in doing away with maximums, not even those discriminating against large families, which are the most objectionable, and have since been declared unconstitutional by several federal courts. *See* Westberry v. Fisher, 297 F.Supp. 1109 (D.Me.1969); Dews v. Henry, 297 F. Supp. 587 (D.Ariz.1969); Williams v. Dandridge, 297 F.Supp. 450 (D.Md. 1968). Moreover, if Congress did wish to encourage the states to eliminate maximums, we must seriously question whether it would "have so beclouded its intent" by being so subtle in method, Lampton I, *supra,* at 355.

Finally, by combining *two unrelated* objectives—expanding eligibility and eliminating maximums—in one amendment to section 402(a), the majority's position is necessarily inconsistent with the internal structure of that provision, which consists of over twenty *single-purpose* state plan requirements.

Clearly, then, lacking any support in the legislative history or the structure of the pertinent section of the Social Security Act, this second proposed purpose cannot be said to have been what Congress had in mind when it legislated section 402(a) (23).

\* \* \*

Before passing to the third and final effect of the statute advanced by the majority, I feel compelled to comment at this time upon my brethren's "credit[ing] the Louisiana Department of Public Welfare] with having eliminated its maximums because of serious doubt as to their validity and not as a backhanded way of avoiding the necessity of increasing the maximums (payments) to reflect the rise in cost of living." Such praise is inappropriate.

At least since October 1968 it has been public knowledge that Louisiana was having difficulty financing its ADC program. This lawsuit as initially brought manifested that problem. But an unexpected windfall in June 1969 of federal funds enabled the state to maintain its

level of ADC payments for the remainder of that fiscal year. With no such windfall now in sight, and with an appropriation for ADC for the current fiscal year 1969–1970 of only $9,043,000 out of a requested $17,320,000, over $400,000 less than the appropriation for the year before, Louisiana, as both the written interrogatories and oral testimony reveal, had to reduce ADC grants by approximately twelve percent.

In order for the state to make this cut and still comply with requirements of the Social Security Act as interpreted by HEW and now by this court, a ratable reduction system was adopted. Consistent with this change, *all* maximums were eliminated as no longer necessary, not just the "family maximum," which treats families with six or more dependent children less favorably than families with a lesser number of dependent children, and which is the only kind of maximum yet attacked by the courts.

To praise Louisiana's action as respect for an impending constitutional mandate, and thus place a constitutional rather than a political imprint upon the act, is therefore not only to belie the scope of the mandate itself, which is limited to family maximums, but also to disregard what has been readily apparent for months, that Louisiana must somehow reduce its ADC outlays.

### C. Emphasize Disparity Between Need and Payment

For Congress' third possible purpose in enacting section 402(a) (23), the majority indicate that if this provision "does nothing else, it spotlights the difference between the amount a state has determined to be the need of its dependent children and the amount its legisla-

ture has appropriated to meet the need along with federal funds."

In response, no more need be said than to ask: Were this provision in fact meant to be so ineffectual as to the states, why were they given *eighteen* months in which to implement it, and why did the Senate-House Conference Committee find it so important to delete the requirement that the cost of living adjustment be made annually? *See* Conf. Rep. No. 1030, 90th Cong., 1st Sess. (1967), U.S.Code Cong. & Ad.News, pp. 3179, 3209 (1967).

\* \* \*

If the aforementioned three purposes for Congress' enactment of section 402 (a) (23) constitute the most forceful attempt possible to give meaning to the statute apart from that for which plaintiffs contend, this effort itself calls into question the viability of the majority's interpretation of the statute. Also indicative of the unreasonableness of their position are the plain meaning of the language of section 402(a) (23) and the clear course of its legislative history, to which the discussion now turns.

### II. MEANING AND INTENT OF SECTION 402(a) (23)

#### A. Plain Meaning

In presenting the question for decision, my brethren misconceive the statute by dividing it into two separate and independent Congressional mandates, notwithstanding Congress' consideration and enactment of the provision as a unified whole.[2] As they see it, the issue before the court is "whether the *second clause* of section 402(a) (23) \*, \* \* prohibits the State from decreasing its ADC payments to reflect fully the changes in living costs \* \*." (Emphasis added.)

---

2. The majority quote the text of section 402(a) (23) in this manner.

"A state plan for aid and services to needy families with children must \* \* \* provide that by July 1, 1969, ▮▮ the amounts used by the State to determine the needs of individuals will have been adjusted to reflect fully changes in living costs since such

amounts were established, and [2] any maximums that the State imposes on the amount of aid paid to families will have been proportionately adjusted."

It must be noted, however, that it is they, not Congress, who inserted the numbers dividing into two separate parts the compound sentence comprising the statute.

Obviously, this seriously misconstrues the statute and misstates the issue, for we are not deciding the effect of solely the first clause or solely the second clause of section 402(a) (23), but the effect of the statute *as a whole*. And when read as a unified provision, as Congress must certainly have intended—it would not have joined in one amendment such disparate elements as the standard of need and maximums if they were not to be related to a single purpose—it is clear that section 402(a) (23) requires the states to increase the level of ADC payments.

The logic of this position is simple, and requires only a basic understanding of the procedures outlined in the margin which the states use to determine the appropriate amount of ADC recipient grants.[3]

Since we all agree that section 402 (a) (23) requires an increase in the standard of need commensurate with the change in the cost of living,[4]

"[t]o determine the purpose served by this mandate * * *, we need only refer to the universal use of the standard of need as the base for computing the level of ADC recipient grants, and the remaining language of section 402 (a) (23), which provides that along with the necessary cost of living changes in need standards, 'any maximums that the State imposes on the amount of aid paid to families will have been proportionately adjusted.' ADC payments in all states are predicated upon the need standard; if this standard is increased, as section 402 (a) (23) requires, the budgetary deficit must also increase accordingly. In those states paying the budgetary deficit in full, as well as in those states that pay only a percentage of the budgetary deficit (or the standard of need), section 402(a) (23) necessarily requires increased ADC grants corresponding to the increase in the standard of need, for a percentage maximum (100 percent or less) kept

3. "Each state estimates its standard of need or assistance, which is the minimum monthly amounts required by its needy citizens for food, clothing, shelter, and other necessities. From this low-income budget, which varies according to the size of the family and is different in different states, each state deducts the income of the recipient, subject to allowable exemptions, leaving what is known as a budgetary deficit. In theory the budgetary deficit is the amount of the assistance payment, but in practice many states pay less by imposing arbitrary dollar maximums on the amount of aid paid, by paying only a fixed percentage of the budgetary deficit, or by a combination of both whereby a fixed percentage is paid but only up to a set dollar maximum. Of the fifty-four jurisdictions participating in the ADC program, twenty-four impose neither a percentage nor a dollar maximum, and pay the full budgetary deficit or 100 percent of need. Seven jurisdictions pay a percentage of the budgetary deficit, while four follow a variant and pay a percentage of the standard of need. Finally, twenty-six jurisdictions, including some which impose percentage reductions, place a legal or administrative dollar maximum on the amount that can be paid.

Amounts are stipulated for each additional child, sometimes up to a family maximum expressed in a dollar amount, or cumulative amounts based on a given number of children are used, limited in terms of the number of children or a maximum payment." *Lampton I, supra* 299 F.Supp. at 349 (footnotes omitted).

4. The majority are mistaken when they say: "We all also agree that the State may give less than 100 percent of the standard of need." This was certainly true before enactment of section 402(a) (23) on January 2, 1968, and may well have been true before the July 1, 1969, deadline for compliance (compare the two opinions in *Lampton I*), but is now no longer the case. As will be shown *infra* at 1398–1399, those states paying full need (100 percent of the standard of need) on January 2, 1968, even if the ultimate payment was restricted by an arbitrary maximum as in Louisiana, must continue to do so or else violate section 402(a) (23). Only those states which previously provided less than 100 percent of need by way of a percentage reduction system may today pay less than 100 percent of need, but the percentage paid must not of course be reduced below that in existence on January 2, 1968.

constant automatically translates increased need into an increased payment. Similarly, in those states imposing an arbitrary dollar maximum on the size of the assistance grant, section 402(a) (23), by requiring that the maximums imposed be adjusted in accordance with the change in the cost of living, insures increased grants for all recipients. Regardless of which system of computing ADC payments the state follows, section 402 (a) (23) is therefore designed to effectuate increased ADC recipient grants. The language of the statute could not be any clearer." Lampton I, *supra,* 299 F.Supp. at 350.

This, I submit, is the most reasonable way to read the statute, and the only analysis which respects both the language used and the intent expressed.

### B. *Legislative History*

Should any doubts remain regarding the propriety of this interpretation, they are certainly dispelled by the clear course of the legislative history, as surveyed in the following excerpt from my dissenting opinion in Lampton I, *supra* 299 F.Supp. at 351–352 (all footnotes have been renumbered):

"Section 402(a) (23) had its genesis before the Senate Committee on Fi-

nance as a proposed amendment by HEW to H.R. 12080, 90th Cong., 1st Sess. (1967), the Social Security Amendments as passed by the House of Representatives. The amendment called for the states to meet need in full as they determined it, and required that the states update their need standards to reflect current prices, and review these standards annually and modify them in accordance with significant changes occurring in the cost of living.[5] Hearings on H.R. 12080 before the Senate Committee on Finance, 90th Cong., 1st Sess., pt. 1, at 635 (1967) [hereinafter Hearings]. Like provisions were suggested for the adult categorical assistance programs.[6] Hearings, pt. 1, at 634–37. These amendments were designed to meet the problem of inadequate and unrealistic assistance payments by compelling increases in the level of payments in all categories.[7]

"Although the Committee extensively modified the far-reaching HEW proposals, the provisions reported out and adopted by the Senate, which were discussed in the Section-by-Section Analysis contained in the Senate Report under the heading Increasing Income of Recipients of Public As-

---

5. The text of the proposed amendment follows:
"[each state plan must provide] (A), effective July 1, 1969, for meeting (in conjunction with other income that is not disregarded, or set aside for future needs, under the plan and other resources) all the need, as determined in accordance with standards applicable under the plan for determining need, of individuals eligible to receive aid to families with dependent children (and such standards shall be no lower than the standards for determining need in effect on January 1, 1967) and (B), effective July 1, 1968, for an annual review of such standards and (to the extent prescribed by the Secretary) for updating such standards to take into account changes in living costs;
* * * *".
Hearings on H.R. 12080 before the Senate Comm. on Finance, 90th Cong., 1st Sess. pt. 1, at 635 (1967).

6. These programs are: Old Age Assistance and Medical Assistance for the Aged, 42 U.S.C. §§ 301–306; Aid to the Blind, 42 U.S.C. §§ 1201–1206; Aid to the Permanently and Totally Disabled, 42 U.S.C. §§ 1351–1355; Aid to the Aged, Blind or Disabled or for such Aid and Medical Assistance for the Aged, 42 U.S.C. §§ 1381–1385.

7. Testifying in support of the proposed additions to the House bill, Secretary of HEW John W. Gardner and Under-Secretary Wilbur J. Cohen documented the inadequacy of assistance payments, especially in the ADC program, and attributed this principally to the states' desire to limit their financial responsibility. Hearings, pt. 1, at 216 (testimony of John W. Gardner); Hearings, pt. 1, at 255–59 (testimony of Wilbur J. Cohen).

sistance, were doubtless intended to ameliorate, though to a lesser degree, the same problem—the low level of assistance grants—in the same manner—requiring the states to increase payments. S.Rep.No. 744, 90th Cong., 1st Sess. (1967), U.S.Code Cong. & Ad. News, 2834, 3132 (1967).

"The Committee bill rejected the HEW recommendation that the states meet needs in full as they determine them. But it did incorporate the annual cost of living adjustment for the ADC program,[8] and substitute in the adult programs a one-time mandatory average increase of $7.50 per month in the amount of assistance,[9] S.Rep.No. 744, 90th Cong., 1st Sess. (1967), U.S.Code Cong. & Ad. News, pp. 2834, 3132 (1967), a change designed to assure that all non-ADC recipients would benefit from the increases.[10] The Senate passed these provisions without amendment,[11] and sent the bill to a Senate-House Conference Committee to iron out the differences. In the Conference Committee the mandatory $7.50 increase for the adult categories was replaced by a $7.50 disregard of income provision discretionary with the states. (This allows a state, if it chooses, to disregard $7.50 of income when computing the

8. The Committee provision required a state plan for ADC to provide that:
   "by July 1, 1969, *and at least annually thereafter*, the amounts used by the State to determine the needs of individuals will have been adjusted to reflect fully changes in living costs since such amounts were established, and that any maximums that the State imposes on the amount of aid paid to families will have been proportionately adjusted." (Emphasis added.)
   Except for the emphasized language which was deleted by the Conference Committee, this provision parallels that enacted by Congress.

9. The Committee provision required that non-ADC plans must:
   "provide that the standards used for determining the need of applicants and recipients for and the extent of such assistance under the plan, and any maximum on the amount of assistance, will have been so modified that an increase in the amount of assistance and other income will not be less than $7.50 per month per individual * * * above such amount of assistance and other income available under the standards and maximum applicable under the plan on December 31, 1966."

10. Since many of the recipients of aid in the adult categories also receive social security benefits, had the cost of living mechanism been used, the intended increase in assistance payments would have been offset for those individuals who are dual beneficiaries by the increase in social security benefits provided by H.R. 12080. (Social security benefits are considered income and serve to reduce the budgetary deficit, which

means a reduced assistance grant.) By assuring each recipient an increase of $7.50 per month in his total amount of assistance and other income, this provision avoids any such offsetting effects. Naturally, this device need not have been employed to assure increased grants in the ADC program, because most ADC recipients do not receive social security benefits. Thus, in this program, the cost of living adjustment proposed by HEW could be retained. S.Rep.No. 744, 90th Cong., 1st Sess. (1967), U.S.Code Cong. & Ad.News, pp. 2834, 3006–07 (1967). See also 113 Cong.Rec.S. 16642 (daily ed. Nov. 16, 1967) remarks of Senator Ribicoff); 113 Cong.Rec.S. 17036 (daily ed. Nov. 22, 1967) (remarks of Senator Randolph).

11. Senator McGovern proposed the only amendment to section 402(a) (23). It would have substituted a $4.00 per month per individual increase in ADC payments for the cost of living adjustment in need standards. The announced purpose of the amendment was to raise ADC payments, which are considerably lower than those in the adult programs, by the same percentage (eleven percent) as the $7.50 increase in the adult programs. 113 Cong.Rec.S. 16963 (daily ed. Nov. 21, 1967) (remarks of Senator Mansfield, who introduced the amendment on behalf of Senator McGovern). In other words, the amendment was designed to insure that in all states—even those where only marginal increases in the cost of living had occurred—ADC recipients obtained the same guaranteed eleven percent increase in their assistance payments as was provided for the adult recipients. The amendment was rejected. *Id.* at S. 16964.

budgetary deficit. The previous figure was $5.00 per month.) Conf.Rep. No. 1030, 90th Cong., 1st Sess. (1967), U.S.Code Cong. & Ad. News, 3179, 3208–09 (1967). No similar change was made in the ADC provision; it remained mandatory upon the states. But the Conference Committee did not leave the Senate provision requiring increases unscathed, for the annual cost of living adjustment was deleted, thus leaving only a one-time cost of living adjustment before July 1, 1969. *Id.*

"Notwithstanding these Conference Committee modifications, it is manifest that the intendment of the Finance Committee and the Senate survived at least with respect to the ADC provision, and that Congress undoubtedly meant what it said in section 402 (a) (23) when it required the states to raise ADC payments. Clearly the course of the provision from its inception before the Senate Committee on Finance until its final passage by Congress allows no other conclusion."

*C. HEW Regulation*

Both the majority and HEW reject the foregoing analysis of the language and history of section 402(a) (23). They argue that the provision does not require increased ADC payments because Congress has intentionally "left open" a method whereby the states can avoid the ostensible effect of the statute to raise payments. This method is set forth in section 233.20(a) (2) (ii) of the HEW Regulations, 45 C.F.R. § 233.20(a) (2) (ii), 34 Fed.Reg. 1394

(1969). The Regulation requires that a state plan for ADC must:

"* * * provide that by July 1, 1969, the State's standard of assistance for the AFDC program will have been adjusted to reflect fully changes in living costs since such standards were established, and any maximums that the State imposes on the amount of aid paid to families will have been proportionately adjusted. In such adjustment a consolidation of the standard (i. e., combining of items) may not result in a reduction in the content of the standard. *In the event the State is not able to meet need in full under the adjusted standard, the State may make ratable reductions* in accordance with subparagraph (3) (viii) of this paragraph [adjustments must be uniform statewide]. Nevertheless, if a State maintains a system of dollar maximums, these maximums must be proportionately adjusted in relation to the updated standards." 45 C.F.R. § 233.20(a) (2) (ii), 34 Fed.Reg. 1394 (1969) (emphasis supplied).

In discussing this Regulation, I again draw upon my dissent in Lampton I,[12] *supra* 299 F.Supp. at 353–354 (all footnotes have been renumbered).

"HEW promulgated this regulation on January 28, 1969, to guide the states in their compliance with section 402 (a) (23) and to 'make it clear that while States must update their standards, if the States do not have the money to pay according to such standards they may make a ratable reduction * * *.' 34 Fed.Reg. 1394 (January 29, 1969).[13] By a ratable

12. The considerable bracketed additions are principally necessitated by Louisiana's having applied its percentage reduction to the budgetary deficit rather than to the standard of need. Although this course was not anticipated in my previous dissent, it does not affect the continued viability of my analysis. Whether the percentage reduction be applied to the standard of need or the budgetary deficit, the necessary effect is to decrease what would otherwise have

been increased by the cost of living adjustment, and thus reduce the ultimate payment.

13. The regulation dealing with section 402(a) (23) was first promulgated in the HEW Interim Policy Statement No. 4, 33 Fed.Reg. 10230 (July 17, 1968). In its initial form the regulation simply restated the statutory provision, thus giving no indication that the effect of the statutory command could be avoided by a ratable reduction.

reduction HEW means that a state may reduce the need standard [or the budgetary deficit] by whatever percentage it chooses, and then compute the level of ADC grants from this reduced basis, which necessarily leads to a lower grant than that resulting from the application of the provisions of section 402(a) (23). For example, states formerly paying 100 percent of need (usually up to an arbitrary maximum) could add the cost of living increase required by section 402(a) (23) to the standard of need (and [eliminate or] adjust their maximums accordingly), and then change and pay a lesser percentage of the increased need [or budgetary deficit], while states paying less than 100 percent of need could make the necessary cost of living adjustment and then pay a still lesser percentage. Thus, while the standard of need and dollar maximums [14] remain at the increased levels mandated by Congress, a state, by following the percentage reduction procedure, could avoid in part or obliterate completely the otherwise necessary and inexorable effect of section 402(a) (23) to raise the level of recipient grants.[15]

"[Both the majority and HEW contend] that Congress having devoted so little attention to section 402(a) (23), it should be interpreted literally to mean no more than its words themselves provide. Accordingly, since the provision commands adjustment only in the standard of need and dollar maximums, and does not refer to the percentage reductions permitted in the regulation, it should not be read to preclude them.[16] In other words, [they seek] to infer a Congressional sanction of percentage reductions from the failure to mention them in section 402(a) (23). However, because a percentage maximum kept constant automatically transfers the increase in the standard of need into an increased payment, it is not at all surprising that Congress did not refer to percentage reductions in section 402 (a) (23); there simply was no need to in order to achieve the desired increases. Therefore, to translate this omission into an implied Congressional sanction of percentage reductions is unwarranted."

In addition, I no longer find any reason to restrict the statutory language "any maximums that the State imposes on the amount of aid paid" solely to dollar maximums. (I did so limit the term in my dissent in Lamption I, *supra* 299 F.Supp. at 354 note 17, but further reflection has convinced me that a broader reading is consistent with the intent of Congress.) As Judge Weinstein has pointed out, "Section 402(a)

---

14. To emphasize that maximums must indeed be proportionately adjusted in relation to the repriced standard of assistance, and that they could not be adjusted and then reduced because of inadequate funds pursuant to section 233.20 (a) (3) (viii) of the Regulations, supra at 353, the last sentence was added to the regulation interpreting section 402 (a) (23). Thus, if funds were inadequate, ratable reductions could be made in relation to the standard of assistance only, not in relation to the maximums. Needless to say, the effect on the level of recipient grants is the same; they are reduced. But, according to HEW, the language of section 402(a) (23) permits one and prohibits the other.

15. The Texas experience is instructive. From paying 100 percent of need for a family of four, up to a dollar maximum of $102.00, the state, in accordance with the HEW regulation, reevaluated the need standards and substituted a percentage maximum of fifty percent. *See* Texas Department of Public Welfare, Office Memorandum E–430 (Feb. 28, 1969) (effective May 1, 1969). A family of four with a typical calculated need of $180.00 will now receive a monthly payment of $90.00. Prior to imposition of the fifty percent maximum, the same family would have received $102.00. * * * [The Texas policy has been declared in violation of section 402(a) (23) in Jefferson v. Hackney, 304 F. Supp. 1332 (N.D.Tex.1969) (three-judge court).]

16. [Footnote deleted.]

(23) speaks of 'any maximum,' not just dollar maximums." Rosado v. Wyman, *supra* at 1377. Inasmuch as a percentage reduction system results in a dollar maximum on the amount of aid given, it is also encompassed by the command of section 402(a) (23). The proportionate adjustment is not, however, made in "the number representing the percentage reduction but, rather, the dollar figure resulting from the application of the percentage to a family's need as determined by the State's standard of need." Rosado v. Wyman, *supra*.

Thus Louisiana, notwithstanding its elimination of dollar maximums, by now paying less than the 100 percent of need it formerly paid, has reduced the dollar figure resulting from the application of the percentage to a family's need, and therefore has reduced its maximums in violation of section 402(a) (23).

"Furthermore, a percentage reduction [in the standard of need or the budgetary deficit] reduces the necessary effect of [an increase in] the standard of need as effectively as a dollar reduction [in the standard of need], which HEW admits 'would fly in the face of the statutory requirement [to update the standard of need], and cannot be accepted.' By both methods the result is a decreased standard of need [or budgetary deficit] which leads to a decreased assistance payment. Ever mindful that 'That which we call a rose, by any other name would smell as sweet,' [17] I must therefore conclude that if a dollar reduction in the standard of need is precluded by implication by section 402 (a) (23), a percentage reduction [of either the standard of need or the budgetary deficit] likewise is prohibited.

"Finally, the HEW interpretation of section 402(a) (23) cannot be accepted for it nullifies the effectiveness of the provision, and a court will 'not suppose that Congress intended to enact unnecessary statutory amendments,' Uptagrafft v. United States, 315 F.2d 200, 204 (4th Cir. 1963), or presume 'that the legislature intended any part of a statute to be without meaning.' General Motors Acceptance Corporation v. Whisnant, 387 F.2d 774, 778 (5th Cir. 1968). * * *

"It is clear, therefore, that the HEW regulation permitting a ratable reduction in the standard of need is violative of the controlling federal statute, and consequently is invalid. King v. Smith, 392 U.S. 309, 333, 88 S.Ct. 2128, 2141, 20 L.Ed.2d 1118 (1968). While I am fully cognizant that the views of an administrative agency should be given due deference when issues of statutory interpretation arise, Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965), '[t]he administrative ruling in this case was no sooner made than challenged. We cannot be certain how far it was determined by the considerations advanced * * * in its defense in this case. It has hardly seasoned or broadened into a settled administrative practice. * * * [And I] do not think it should overweigh the considerations * * * set forth as to the proper construction of the statute.' Davies Warehouse Co. v. Bowles, 321 U.S. 144, 156, 64 S.Ct. 474, 481, 88 L.Ed. 635 (1944)."

### D. *Summary*

Stressing that the Social Security Act is an example of "cooperative federalism," and that the states previously have determined the level of ADC benefits by the amount of funds devoted to the program, my brethren apparently do not feel warranted in saddling Louisiana with the financial burden of increased ADC expenditures "without clear statutory language supported by unmistakable legislative history." What most seems to concern the majority is that any bill having this significant an effect upon state expenditures would have been a "burning issue" in Congress. Finding

17. Shakespeare, Romeo and Juliet, Act II, Scene 2.

few charred remains in the legislative history, they feel compelled to conclude that "no great cost effect was anticipated." Yet, as summarized by Judge Weinstein, "[t]he language of the basic requirements of 402(a) (23) remained virtually unchanged throughout its legislative evolution. There is no hint from either committee that it intended to change the purpose of the section as expressed by Administrative spokesmen. Hence, there is no reason to believe that Congress failed to appreciate the import and plain meaning of the language in 402(a) (23)." Rosado v. Wyman, *supra* at 1376.

> And as I stated in my dissent in Lampton I, *supra* 299 F.Supp. at 352–353:

> "That this abrupt shift in Congressional policy, which for approximately thirty-five years had allowed the states complete freedom to determine the level of assistance grants, was unaccompanied by extensive committee reports, floor debates, and cost estimates is immaterial when, as here, the Congressional purpose to make such a shift is otherwise clearly discernible. 'A restrictive interpretation should not be given a statute merely because Congress has chosen to depart from custom * * *.' United States v. Sullivan, 332 U.S. 689, 693, 68 S.Ct. 331, 334, 92 L.Ed. 297 (1948). However significant the departure may be, the duty of the court 'to search out and follow the true intent of the legislature, and to adopt that sense of the words, which harmonizes best with the context, and promotes in the fullest manner the apparent policy and objects of the legislature' remains the same. United States v. Winn, 28 Fed.Cas. pp. 733, 734 (No. 16,740) (C.C.D.Mass.1838) (Story, J.), quoted approvingly in Johnson v. Southern Pacific Company, 196 U.S. 1, 18, 25 S.Ct. 158, 162, 49 L.Ed. 363 (1904)."

\* \* \*

We must not be influenced in deciding this case by Louisiana's threatened withdrawal from the ADC program should plaintiffs be successful in this suit. While this would prove catastrophic for those thousands of families who depend upon this program for food and shelter, it is a necessary risk of the very cooperative federalism relied upon by the majority in support of their position.

Meaningful and effective programs of federal-state cooperation require that, in return for federal financial assistance, the states comply with certain minimum standards established by Congress. Only in this way can Congress be assured its policy objectives are carried out.

Through such cooperative programs Congress has fostered the construction of a uniform interstate highway system connecting all parts of the country. If under a threat of non-participation federal construction standards had been relaxed to meet the needs of individual states, it is certain that no such uniform system would now exist. Similarly, but more importantly, desegregation of schools and hospitals and other federally-funded services has been facilitated by previous strict enforcement of federal desegregation guidelines under Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d, 2000d–1, which allows for the cutoff of federal funds when the aforementioned guidelines are not being met. Despite the hardship the cutoff of funds often causes for those very persons whom the procedure is designed to assist, it is clear today that without such strict enforcement the level of desegregation would be considerably less than at present.

Federal welfare standards are no less deserving of enforcement. To have it otherwise would seriously jeopardize the cooperative aspect of these programs, not to mention their objectives. If the standards imposed are too strict or too burdensome upon the states, their avenue of redress should be through Congress, not through a restrictive interpretation of these standards by the courts.

## III. CONCLUSION

Louisiana's proposed ratable reduction system, which will result in payments to families receiving ADC which are smaller than the amounts received in June 1969, as adjusted to reflect the change in the cost of living, is inconsistent with the terms and conditions imposed by the federal government upon those states voluntarily participating in this federally-funded program, and consequently is invalid.[18]

I would immediately enjoin implementation of this system, and order that Louisiana comply with section 402(a)(23), which requires that by July 1, 1969 ADC payments be increased by the change in the cost of living since the standard of need was last established. King v. Smith, *supra;* Solman v. Shapiro, 300 F.Supp. 409 (D.Conn.1969); Williams v. Dandridge, *supra.*

---

18. "There is of course no question that the Federal Government, unless barred by some controlling constitutional prohibition, may impose the terms and conditions upon which its money allotments to the States shall be disbursed, and that any state law or regulation inconsistent with such federal terms and conditions is to that extent invalid." King v. Smith, 392 U.S. 309, 333, n. 34, 88 S.Ct. 2128, 2141, n. 34 (1968).